UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Harley Marine NY, INC., <br><br> Plaintiff, <br><br> v. <br><br> BRIAN MOORE, <br> CARVER MARINE STEEL WORKS, <br> LLC d/b/a CARVER COMPANIES, <br><br> Defendants. | CIVIL ACTION <br> CASE NO. _____1:23-cv-163 (ANM/CFH)_____ <br><br> **COMPLAINT** |

**Complaint For Damages And Injunctive Relief**

Plaintiff, Harley Marine NY, Inc. ("HMNY" or the "Company" or "Plaintiff"), by and through their undersigned counsel, for their Complaint against Defendants Brian Moore ("B. Moore") and Defendant Carver Marine Steel Works, LLC d/b/a Carver Companies ("Carver"), hereby allege as follows:

**Introduction**

1. This action is brought to remedy the unlawful, duplicitous, and disloyal conduct of former HMNY employee B. Moore in the theft of HMNY's confidential, proprietary, and trade secret information along with his improper inducement of other HMNY employees to join his current employer, Carver in violation of his agreement and obligations to HMNY. This action is also brought to prevent both B. Moore and Carver from further harming HMNY's commercial interests stemming from B. Moore's violative conduct.

2. HMNY is a premier marine transportation operator with one of the largest and most diverse fleets serving the West, East, and Gulf Coasts of the United States.

1

3. B. Moore was formerly employed with HMNY in its Bayonne, New Jersey office as the Company's Director of U.S. East Coast Operations until his abrupt resignation.

4. In connection with his employment with HMNY, B. Moore signed a confidentiality agreement (the "Confidentiality Agreement") dated February 6, 2018, which contained, among other things, which contained, among other things, provisions detailing his obligations vis-à-vis HMNY's confidential information and an agreement to not directly or indirectly induce or encourage HMNY's employees to leave HMNY.

5. Soon after B. Moore's resignation, HMNY learned that B. Moore had flagrantly violated his Confidentiality Agreement. In particular, HMNY learned that he solicited Joseph Stevenson ("Mr. Stevenson"), Leonard Baldassare ("Mr. Baldassare"), and ("Mr. Galm") to leave the Company and work for B. Moore's new employer, Carver.

6. HMNY also learned that B. Moore downloaded via Dropbox several of HMNY's proprietary and confidential documents *after* the end of his employment with HMNY in express violation of his Confidentiality Agreement. These documents would provide any competitor of HMNY a distinct competitive advantage.

7. Carver—B. Moore's new employer—provides similar services as HMNY with respect to the use of tugboats, such as "tug and barge" (inland and offshore towing) and ship assists. Upon information and belief, Carver is aware of B. Moore's flagrant theft of HMNY's proprietary and confidential information and yet continues to employ B. Moore in a capacity where Carver stands to benefit from B. Moore's theft.

8. Accordingly, HMNY brings suit for (1) breach of the Confidentiality Agreement against B. Moore under New Jersey Common Law; (2) violations of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 and New Jersey Trade Secrets Act, ("NJTSA") against B. Moore and

Carver; (3) violations of the New Jersey Computer Record Offenses Act against B. Moore; (4) tortious interference with economic relations under New Jersey common law against B. Moore; (5) tortious interference with contractual relations under New Jersey common law against Carver; (6) unfair competition under New Jersey common law against B. Moore and Carver.

## Parties

9. Plaintiff HMNY is a New York corporation, with its principal office located in 91 SW Spokane Street, Seattle, Washington 98134.

10. Upon information and belief, Defendant B. Moore is a New York resident who resides at 7 Fairview Avenue, Kingston, NY 12401.

11. Upon information and belief, Defendant Carver is New York corporation, with its principal office located in 2170 River Road, Coeymans, NY 12045.

## Jurisdiction and Venue

12. Jurisdiction is proper in this Court under 28 U.S.C. § 1331, as Plaintiff asserts claims arising under the laws of the United States.

13. Jurisdiction over Plaintiff's state law claims is proper in this Court under 28 U.S.C. § 1367, because those claims are so related to Plaintiff's federal claim that they form part of the same case or controversy.

14. The Court has jurisdiction over B. Moore and Carver because both Defendants, upon information and belief, reside in the state of New York.

15. Venue is proper in this Court under 28 U.S.C. § 1391 because both Defendants, upon information and belief, reside in this District.

## Factual Allegations

3

16. HMNY is a premier marine transportation operator which offers its customers various services, including: (i) bunkering; (ii) terminal transportation; (iii) ship assists and escort; (iv) rescue and general towing; and (v) freight barge transportation.

17. In 2018, B. Moore began his employment HMNY as a Captain, out of Bayonne, New Jersey. By February 2020, B. Moore was promoted to Director of U.S. East Coast Operations.

**The Confidentiality Agreement**

18. In connection with his employment, B. Moore signed a Confidentiality Agreement, which contained, among other things, provisions detailing with his obligations vis-à-vis HMNY's confidential information and an agreement to not induce HMNY's employees to leave HMNY.

19. Given the sensitive nature of the confidential business and industry information to which B. Moore was exposed, it was critical to HMNY that he agree to a confidentiality agreement to ensure that, if B. Moore ever left his employment, the information to which B. Moore had access would not be stolen by a competitor or be accessed by any other unauthorized party. Section 1 and 2 of the Confidentiality Agreement state:

> **1. Trade Secrets and Confidential Information**. Employee recognizes and agrees that he/she shall treat as confidential and proprietary all aspects of the Employer's business that is not generally known to the public including, but not limited to, customer identities and information, rates charged/billed, services performed, contract terms, the history of the relationship between the Employer and its customers, and the identity of customers' contracting agencies; pricing information; sales information; prospect lists; policy manuals; procedure manuals and techniques; business financial data and records; staffing, organizational structures and compensation/benefit programs, to include employment contracts; information programs and systems; information relating to any pending or potential future litigation, to include investigations by any federal or state agencies or other regulatory agencies; training techniques; and all other forms of technical and proprietary information which was developed by the Employer. Employee also agrees never, directly or indirectly, to use, disseminate, disclose, or otherwise reveal any such information or material to any person,

>firm, corporation, association, or other entity doing, or planning to do, business in competition with the Employer for any reason or purpose whatsoever without the prior written consent of the Employer
>
>**2. Property of the Employer**. Employee agrees that the originals and copies of all files, records, lists, specifications, documents, equipment and software, whether prepared by the Employer or a product of other employees, are and shall remain the exclusive property of the Employer. The above mentioned information will not be used or retained by the Employee except in the course of employment by the Employer. Upon termination of employment or at the request of the Employer at any time, all such items in the possession of the Employee shall be returned to the Employer.

20. In executing the Confidentiality Agreement, B. Moore voluntarily agreed not to share, disclose, or otherwise use the Company's information unless it directly related to his employment with the Company. Section 4 of the Confidentiality Agreement states:

>**4. Confidentiality Obligations Continue After Employment Ends**. Employee understands and acknowledges that his or her obligations under this Agreement with regard to any particular Confidential Information shall commence immediately upon the Employee first having access to such Confidential Information, whether before or after he or she begins employment by the Employer, and shall continue during and after his or her employment by the Employer until such time as such Confidential Information has become public knowledge other than as a result of the Employee's breach of this Agreement or breach by those acting in concert with the Employee or on the Employee's behalf.

21. The Confidentiality Agreement also contains a reasonable non-solicitation provision which prohibits B. Moore from poaching HMNY's employees to work for him or another employer. Indeed, pursuant to Section 12, B. Moore agreed that he would not:

>**12. Non-Solicitation**. Employee agrees they will not directly or indirectly solicit, induce, or otherwise persuade employees to leave HMS to work for or with Employee or a third party.

### B. Moore Suddenly Leaves HMNY

22. On or about November 18, 2022 HMNY received unexpected news that B. Moore had resigned from his position. Prior to his resignation, B. Moore had never mentioned his plans to resign or even made any comments or references indicating that he was looking to leave the Company for another opportunity. In fact, HMNY had just increased his salary.

23. After B. Moore submitted his resignation, B. Moore was guarded about his reasons for leaving the Company and about the identity of his new employer. Instead, B. Moore simply told HMNY that he was leaving to work for a "tugboat" business. He did not share with HMNY what his new job title would be for this new employer.

24. Although B. Moore was scheduled to work for HMNY up until December 2, 2022, his last day of work at the Company was November 30, 2022. Through social media HMNY learned that B. Moore was a "General Manager" for Carver—another business that provides a variety of tugboat services.

25. On or about December 1, the Company mailed B. Moore a "termination package," in which he was reminded of his legal obligations arising from the Confidentiality Agreement that he signed upon his hiring. Specifically, this letter reminded B. Moore to "please understand the terms of the [Confidential] agreement still apply."

### B. Moore's Recruitment and Solicitation of HMNY's employees

26. Soon after his departure, HMNY discovered that B. Moore was actively recruiting certain key employees of HMNY. Specifically, HMNY learned that he recruited and solicited Mr. Stevenson, Mr. Baldassare, and Mr. Galm to leave the Company and work for B. Moore's new employer, Carver.

27. Mr. Stevenson began working for HMNY the same year as B. Moore. He was initially hired to work as a Warehouse Operations Assistant and was later promoted to Deckhand.. During his employment, Mr. Stevenson worked closely with B. Moore.

28. Mr. Baldassare began working for HMNY in 2019 as an Assistant Port Captain. He was eventually promoted to Senior Port Captain, and worked alongside B. Moore, who was also his direct supervisor.

29. Mr. Galm has been with HMNY since January 2017—well before B. Moore began his employment with the Company. Initially, Mr. Galm was hired to work as a Barge Mate. Throughout his employment, Mr. Galm was given many opportunities to learn more about the business from an operational side. Eventually, the experience he gained at HMNY led him to be promoted within the Company to the position of Marketing and Logistics Manager. In that role, Mr. Galm had significant interfacing with HMNY's customers.

30. On December 14, 2022, Mr. Stevenson resigned from his position as Deck Hand. On or around that same day, Mr. Stevenson mentioned that B. Moore "had asked him to come work for him at Carver," and that he did not want to pass up the opportunity. It was deeply disturbing that B. Moore would so blatantly solicit Mr. Stevenson to work for another maritime business given that recruiting and retaining experienced mariners is a significant challenge in the industry.

31. On January 16, 2023, Mr. Galm told HMNY that he had received another job offer that he felt he needed to pursue for his family. Mr. Galm also assured the Company that he was not seeking this opportunity, but that the opportunity came to him. Mr. Galm told the Company, "I have to be honest with you, I am leaving to go work with Brian [Moore] at Carver." Mr. Galm also stated that "Brian was [his] Captain," referring to the close relationship he had with B. Moore.

32. The day after Mr. Galm resigned, on January 17, 2023, Mr. Baldassare, also resigned from his position. Mr. Baldassare also mentioned that B. Moore had spoken to him and convinced him to join B. Moore to work for Carver. Of note, Mr. Baldassare told HMNY that B. Moore had arranged for him to be working for Carver, out of Caddell's Shipyard in Staten Island, closer to Baldassare's home, even though, upon information and belief, Carver had never had any offices in Caddell's Shipyard prior to B. Moore's departure.

33. For the past four years, Mr. Galm was considered to be HMNY's point person for all contract negotiations and potential customer opportunities. Indeed, each month, Mr. Galm was responsible for handling several million dollars' worth of HMNY's business revenues. In addition to having important financial functions for HMNY, a major aspect of Mr. Galm's role was also to check on competitive activity and to develop new methods for capturing market shares from competitors and to develop new methods to obtain new contracts or accounts.

34. Additionally, Mr. Baldassare had significant influence in the development of HMNY's company operations and procedures. In fact, B. Moore and Mr. Baldassare were the decisionmakers on the day-to-day operational issues for HMNY's East Coast operations.

**B. Moore's Theft of HMNY's Confidential Information**

35. Given B. Moore's blatant and intentional violations of the non-solicitation clause, HMNY decided to further investigate B. Moore's last activities before leaving the Company.

36. On or about January 19, 2023, HMNY checked the activity log of HMNY's Dropbox account which provides the following data: (i) the employee's username; (ii) the type of activity performed while logged in (e.g. downloads, transfer of file); (iii) the device used to log-in to the account (desktop v. mobile); (iv) the location where the employee member logged in to the

account; and (v) the filename extension which indicates the nature of the document viewed or downloaded.

37. The Dropbox Activity Log revealed that B. Moore, using his HMNY log-in information, had logged in HMNY's Dropbox account well after he left the Company. Specifically, B. Moore logged in to HMNY's Dropbox on the following dates: (i) December 18, 2022 in Kingston, New York; (ii) December 30, 2022 in Kingston, New York; and (iii) January 5, 2023 in Buffalo, New York. On those dates, B. Moore had already begun working for Carver.

38. The Dropbox Log also revealed that B. Moore had accessed and downloaded various files regarding the Company's tugboats, including (i) Stability Letters regarding each tugboat's seaworthiness; (ii) "Blue Cards" from the Company's insurance carrier in London, U.K.; (iii) Bridge Letters showing the various corporate entities who own each vessel; (iv) equipment list for each vessel; and (v) "spec sheets" showing operating and mechanical data for each tug boat such as: fuel capacity, fluid density, flow rate, and operating pressure and temperature. This information is confidential information not accessible in the public realm.

39. The Dropbox Log also revealed that B. Moore downloaded a file called "Master Voyage Economics2.Numbers" ("Master Voyage"). This document contains particularly sensitive, highly confidential and proprietary information. Specifically, it is a pricing and bidding sheet with information based on internal knowledge that HMNY has accumulated over the last two decades, including but not limited to: (i) specific and actual performance of each HMNY vessel (i.e. how much fuel was burned, speed, distance); (ii) voyage runs and distances traveled; (iii) specific routes that can be operated safely; and (iv) expenses for consumables. This type of information is plugged into an Excel spreadsheet, which then calculates and converts this information into a "day rate,"

9

for each vessel. The day rate is a metric that HMNY uses to determine its price rates for existing and new customers and profitability or financial viability of those rates.

40. The data and information contained in the "Master Voyage" spreadsheet is not publicly available and is considered highly confidential. In fact, only few employees working for HMNY have access to this information—(i) the Sales and Charter Team, which includes Dylan Galm; (ii) the Executive Team; and (iii) Directors of Operations, which included B. Moore.

41. The Dropbox Activity Log shows that B. Moore accessed HMNY's information using a mobile device from two locations—Kingston and Buffalo, New York. Based on HMNY's employment records, B. Moore resides in Kingston, New York, and based on an online search, Carver maintains an office in Buffalo, New York. Given that HMNY does not have any presence in either Kingston and Buffalo, there is no doubt that B. Moore was wrongfully accessing and downloading HMNY's information from his home and while working from his new employer's offices. After learning that of B. Moore's unauthorized access and theft of documents, HMNY quickly terminated B. Moore's access and deactivated his username.

**HMNY Sends Cease-and-Desist Letters B. Moore and Carver**

42. In an attempt to avoid the necessity of court proceedings, on January 20, 2023, legal counsel for HMNY sent cease-and-desist letters to both B. Moore and Carver. In the letters, HMNY disclosed its discovery of B. Moore's wrongful solicitation of HMNY employees as well as his theft of Company information.

43. On January 23, 2023, HMNY's legal counsel received a response from B. Moore where he disingenuously denied taking any information belonging to HMNY other than one document titled "HMS Liberty," which he claims he inadvertently took with him. He denied

10

accessing HMNY's Dropbox account and stated that he had returned HMNY's laptop and his work phone on the last day of employment, so he "cannot account for the log-in after [his] departure."

44. However, the fact that B. Moore had turned over his HMNY's work equipment is irrelevant because it would not stop his ability to access the Company's Dropbox account. According to the Dropbox Activity Log, B. Moore very likely used his personal mobile device to access the Dropbox website and using his former HMNY username and password credentials.

45. Notably, in his response letter, B. Moore did not deny talking to or recruiting HMNY employees. Instead, he simply claimed that the departure of Mr. Galm, Mr. Stevenson, and Mr. Baldassare were not "initiated" by him. Essentially, he admitted that he played a role in soliciting and encouraging the departure of these employees.

### Count I – Breach of Contract under New Jersey Common Law
### (against Defendant B. Moore)

46. HMNY hereby adopts and re-alleges the allegations set forth in Paragraphs 1 through 45 above.

47. The Confidentiality Agreement includes choice-of-law provision which provides that New Jersey Law will apply to this proceeding.

48. Pursuant to the Confidentiality Agreement, B. Moore has an undisputed obligation not to use or disclose HMNY's confidential and proprietary information without authorization pursuant to his Confidentiality Agreement. He likewise had and continues to have an undisputed contractual obligation return and not take HMNY's valuable information after he decided to leave HMNY.

49. B. Moore undoubtedly violated these provisions of the Confidentiality Agreement by accessing and downloading various confidential files regarding the Company's tugboats weeks after the end of his employment with HMNY.

50. As a direct consequence of this egregious breach, HMNY has, at the very least, not received the benefit of the bargain associated with the Confidentiality Agreement with B. Moore, and will suffer an even greater harm if B. Moore is not enjoined from sharing HMNY's confidential information with Carver thereby further breaching the agreement.

51. Pursuant to his Confidentiality Agreement, B. Moore also had an undisputed obligation to not solicit HMNY's to work for another employer.

52. B. Moore breached this contractual obligation by inducing three HMNY employees to leave HMNY to work for Carver mere weeks after he himself left HMNY.

53. The departure of these employee in a tight labor market after investing substantial resources in their training and development has greatly harmed HMNY.

54. If B. Moore is not enjoined from further inducing or soliciting HMNY's employees, he could further harm irreparably harm HMNY's business by inducing additional employees to work elsewhere.

55. HMNY performed its own contractual obligations under the Confidentiality Agreement.

56. In the event of a breach or threatened breach of the Confidentiality Agreement, HMNY is entitled to an injunction restricting B. Moore from committing or continuing the breach or threatened breach under the Confidentiality Agreement.

57. As a direct and proximate cause of the B. Moore's breach of contract, HMNY has suffered, and continues to suffer, substantial damages, including, without limitation, the loss of former and/or future employees, loss of economic advantage, and denial of its bargained for exchange, and, accordingly, HMNY is entitled to damages in an amount to be determined at trial.

58. HMNY will continue to be directly and proximately damaged if B. Moore is not immediately and permanently enjoined from further breaching the Confidentiality Agreement and prohibited from further accessing, using, and disclosing HMNY's proprietary and confidential information and soliciting its employees to work elsewhere.

59. HMNY has no adequate remedy at law and is suffering irreparable injury and damages as a result of B. Moore's actions.

### Count II – Misappropriation of Trade Secrets
### Pursuant To The Defend Trade Secrets Act (18 U.S.C. § 1836) and New Jersey Trade Secrets Act (N.J.S.A. § 2A:38A-3)
### (against B. Moore and Carver)

60. HMNY hereby adopts and re-alleges the allegations set forth in Paragraphs 1 through 59 above.

61. Among the multitude of documents B. Moore illicitly downloaded after the end of his employment include pricing and bidding sheets with information that HMNY has accumulated over the last two decades, specifically: (i) specific and actual performance of each HMNY vessel (i.e. how much fuel was burned, speed, distance); (ii) voyage runs and distances traveled; (iii) specific routes that can be operated safely; and (iv) expenses for consumables.

62. B. Moore also stole various files that include the technical data regarding the Company's tugboats, including equipment list for each vessel and "spec sheets" showing operating and mechanical data for each tug boat such as: fuel capacity, fluid density, flow rate, and operating pressure and temperature.

63. The information B. Moore downloaded is not publicly available and HMNY took assiduous efforts to protect this information including by having employees who were exposed to this information, such as B. Moore, sign Confidentiality Agreements and by shielding this information behind a password-protected website.

64. The means used by B. Moore in effectuating this misappropriation, namely downloading HMNY's proprietary and confidential documents after the end of his employment in HMNY in violation of the Confidentiality Agreement, were intentional, malicious, unlawful, unfair, and otherwise improper.

65. Upon information and belief, B. Moore misappropriated HMNY's trade secrets for his own benefit and the benefit of Carver. B. Moore and Carver have utilized and disclosed and/or inevitably will utilize and disclose HMNY's trade secrets, which were obtained unlawfully, for their own benefit, for the purpose of competing against HMNY unfairly.

66. As a direct and proximate cause of the B. Moore and Carver's misappropriations, HMNY has suffered, and continues to suffer, substantial damages, including, without limitation, divulgement of its proprietary and confidential and information and loss of economic advantage, and, accordingly, HMNY is entitled to damages in an amount to be determined at trial.

67. HMNY will continue to be directly and proximately damaged if B. Moore and Carver are not immediately and permanently enjoined from further accessing, using, and disclosing HMNY's proprietary and confidential information.

68. HMNY has no adequate remedy at law and is suffering irreparable injury and damages as a result of B. Moore and Carver's actions.

### Count III - Violation of the New Jersey Computer Offenses Act
### (N.J.S.A. § 2A:38A-3)
### (against B. Moore)

69. HMNY hereby adopts and re-alleges the allegations set forth in Paragraphs 1 through 68 above.

70. The Confidentiality Agreement includes a choice-of-law provision which provides that New Jersey Law will apply to this proceeding.

71. B. Moore knowingly took, without authorization, HMNY's proprietary and confidential documents by downloading these documents via Dropbox in violation of the Confidentiality Agreement which expressly prohibited his unauthorized taking.

72. HMNY will be damaged by B. Moore's unauthorized access of its Confidential Information because B. Moore will be able to use the information to help Carver compete unfairly with HMNY.

73. As a direct and proximate cause of the B. Moore's violation, HMNY has suffered, and continues to suffer, substantial damages, including, without limitation, divulgement of its proprietary and confidential information and loss of economic advantage, and, accordingly, Plaintiff is entitled to damages in an amount to be determined at trial.

74. HMNY will continue to be directly and proximately damaged if B. Moore is not immediately and permanently enjoined from further accessing, using, and disclosing HMNY's proprietary and confidential information.

75. HMNY has no adequate remedy at law and is suffering irreparable injury and damages as a result of B. Moore's actions

### Count IV – Tortious Interference with Economic Relations under New Jersey Common Law
### (against B. Moore)

76. HMNY hereby adopts and re-alleges the allegations set forth in Paragraphs 1 through 75 above.

77. The Confidentiality Agreement includes a choice-of-law provision which provides that New Jersey Law will apply to this proceeding.

78. HMNY had a reasonable expectation that B. Moore would not solicit its employees to work for another employer in violation of the Confidentiality Agreement that he undoubtedly signed prior to his employment with HMNY.

79. HMNY was deprived of its employment relationships with three valuable employees as a direct result of B. Moore's malicious and violative conduct.

80. As a direct and proximate cause of the B. Moore's tortious interference, HMNY has suffered, and continues to suffer, substantial damages, including, without limitation, the loss of former and/or future employees and loss of economic advantage, and, accordingly, HMNY is entitled to damages in an amount to be determined at trial.

81. HMNY will continue to be directly and proximately damaged if B. Moore is not immediately and permanently enjoined from further soliciting its employees to work elsewhere.

82. HMNY has no adequate remedy at law and is suffering irreparable injury and damages as a result of B. Moore's actions

### Count V – Tortious Interference with Contractual Relations under New Jersey Common Law
### (against Carver)

83. HMNY hereby adopts and re-alleges the allegations set forth in Paragraphs 1 through 82 above.

84. The Confidentiality Agreement includes a choice-of-law provision which provides that New Jersey Law will apply to this proceeding.

85. The Confidentiality Agreement between HMNY and B. Moore prohibits him from disclosing the company's proprietary and confidential information.

86. Upon information and belief, Carver hired and continues to employ B. Moore for the purpose of accessing the company's confidential and proprietary information, which has, and continues to cause B. Moore to breach his Confidentiality Agreement.

87. As a direct and proximate cause of the Carver's tortious interference, HMNY has suffered, and continues to suffer, substantial damages, including, without limitation, the loss of its bargained for exchange with B. Moore and loss of economic advantage, and, accordingly, HMNY is entitled to damages in an amount to be determined at trial.

88. HMNY will continue to be directly and proximately damaged if Carver is not immediately and permanently enjoined from further accessing, using, and disclosing HMNY's proprietary and confidential information.

89. HMNY has no adequate remedy at law and is suffering irreparable injury and damages as a result of Carver's actions.

### Count VI – Unfair Competition under New Jersey Common Law
### (against B. Moore and Carver)

90. HMNY hereby adopts and re-alleges the allegations set forth in Paragraphs 1 through 89 above.

91. The Confidentiality Agreement includes a choice-of-law provision which provides that New Jersey Law will apply to this proceeding.

92. B. Moore violated his duty of good faith and fair dealing by maliciously downloading HMNY's proprietary and confidential property in express violation of his Confidentiality Agreement.

93. Carver has also engaged in unfair competition by hiring and continue to employ B. Moore, on information and belief, for the purpose of accessing HMNY's confidential information for competitive benefit.

17

94. As a direct and proximate cause of the B. Moore and Carver's unfair competition, HMNY has suffered, and continues to suffer, substantial damages, including, without limitation, divulgement of its proprietary and confidential and information and loss of economic advantage, and, accordingly, HMNY is entitled to damages in an amount to be determined at trial.

95. HMNY will continue to be directly and proximately damaged if B. Moore and Carver are not immediately and permanently enjoined from further accessing, using, and disclosing HMNY's proprietary and confidential information.

96. HMNY has no adequate remedy at law and is suffering irreparable injury and damages as a result of B. Moore and Carver's actions

## **Prayer For Relief**

97. WHEREFORE, HMNY demands judgment on all Counts of this Complaint and an award of equitable and monetary relief, jointly and severally, against Defendants as follows:

    (a) Entry of temporary, preliminary, and permanent injunctions pursuant to Federal Rule of Civil Procedure 65 enjoining:

        (i) Defendants B. Moore and Carver from retaining any secret, confidential, or proprietary information belonging to HMNY that is in tangible form (including computer files, removable media "thumb drives," CDs, electronic files on removal media or in any other electronic form, and hard copy documents) and instead returning all copies of such documents, materials, computer files and other data to HMNY;

        (ii) Defendants B. Moore and Carver from using, or disclosing HMNY's confidential, proprietary, and trade secret information;

        (iii) Defendants B. Moore and Carver from modifying, deleting, altering or destroying any of HMNY's communications, files, documents, materials, or data obtained or removed from HMNY or reflecting information accessed at or obtained from

HMNY, including any confidential information, and documents or other evidence reflecting the removal, use or disclosure of any confidential information including but not limited to printed documents or data in any electronic format, however stored, including any type of computer, disk, storage device or otherwise, or destroying evidence of the accessing, transfer, copying, use or disclosure of such information;

   (iv) Defendants B. Moore and Carver from directly or indirectly soliciting or inducing clients of HMNY that are known to B. Moore as clients of HMNY;

   (v) Defendant Carver from engaging or associating with Defendant B. Moore to compete with HMNY in the maritime transportation industry in the United States;

   (vi) Defendant B. Moore from directly or indirectly soliciting or inducing HMNY employees to work for Defendant Carver, Defendant B. Moore, or any third party;

 (b) Entry of an Order requiring Defendant B. Moore and Carver to account for and pay HMNY for all profits and damages resulting from Defendants' unlawful acts as described herein;

 (c) Entry of an Order requiring Defendant B. Moore and Carver to pay punitive and/or liquidated damages;

 (d) Entry of an award of HMNY's costs and reasonable attorneys' fees and investigative fees associated with bringing this action;

 (e) Entry of an award of pre-judgment interest on the judgment amount;

 (f) Entry of an Order for any further relief as the Court may deem just and proper.

Dated:  February 7, 2023      Respectfully submitted,

**AKERMAN LLP**

/s/ Scott M. Kessler
Scott M. Kessler
Jeffrey A. Kimmel (admission pending)
1251 Avenue of the Americas, 37th Floor
New York, New York 10020
Email: Scott.Kessler@akerman.com
Telephone: (212) 880-3874
Facsimile: (212) 880-8965
*Attorneys for Plaintiff HMNY*