UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HARLEY MARINE NY, INC.<br><br>                      Plaintiffs,<br><br>v.<br><br>BRIAN MOORE,<br>CARVER COMPANIES,<br><br>                      Defendants. | CIVIL ACTION<br>CASE NO. 1:23-cv-00163-AMN-CFH |

## DECLARATION OF KELLY MOORE

I, **Kelly Moore**, hereby declare as follows**:**

    1.    I am the Senior Vice President of East & Gulf Operations for Centerline Logistics Corporation ("Centerline"), which solely owns and operates Harley Marine NY, Inc. ("HMNY" or the "Company"). In my current role at Centerline, I am responsible for overseeing HMNY business operations for the East and Gulf Coast regions.

    2.    I am over the age of 21 and fully competent to make this Declaration. I have personal knowledge of all the facts in this declaration. The statements made in this Declaration are based on my personal knowledge.

### EMPLOYMENT OF DEFENDANT BRIAN MOORE

    3.    I have over 20 years of experience in the maritime industry. Since 2008, I have worked in various positions for Centerline and HMNY—from Barge

1

Supervisor to Director of Operations.

4. In my current role as Senior VP, I am involved in approving the hiring decisions for certain maritime personnel for HMNY, including the hiring of Defendant, Brian Moore ("B. Moore")

5. In 2018, HMNY hired B. Moore to work as a Captain. At the time of his hiring, B. Moore only had experience working as a tugboat captain. However, he performed and was promoted several times throughout his employment.

6. The Company also provided him many opportunities to expand his knowledge of the maritime transportation business and to develop a much broader skillset than that of a tugboat captain. By February 2020, B. Moore was promoted to Director of U.S. East Coast Operations. In that role, Mr. Moore reported directly to me.

7. During his employment with the Company, I had daily interactions with B. Moore. Although I travel frequently for my job, I primarily work out of HMNY's offices in Bayonne, New Jersey ("Bayonne Office"). Though HMNY has over 200 employees, only about twenty-five (25) employees work out of the Bayonne Office, including B. Moore, Joseph Stevenson and Leonard Baldassare. Other employees—not working directly on the fleet—worked remotely, including Dylan Galm. Regardless of location, we all knew each other very well based on our frequent interactions around the Bayonne office or through various virtual business meetings.

## DEFENDANT MOORE SIGNS A CONFIDENTIALITY AGREEMENT WITH NON-SOLICITATION CLAUSE

8. As part of his onboarding process, B. Moore signed a Confidentiality Agreement, in which he agreed that he was not to share, disclose, or otherwise use the Company's information unless it directly related to his employment with the Company. The Confidentiality Agreement also contained a Non-Solicitation of Employees clause ("Non-Solicitation Clause"). An accurate copy of this Confidentiality Agreement is attached as Exhibit 1.

9. The Non-Solicitation Clause is extremely important because HMNY has a significant business interest in recruiting and retaining qualified mariners to carry out its maritime operations.

10. The maritime industry is a niche market with a very limited labor pool. With the issuance of new U.S. Coastguard regulation standards as well as the recent labor shortage, it has become increasingly difficult for HMNY to find and train new employees to work on their fleet. For this reason, HMNY requires its employees to agree—in writing—to refrain from poaching or soliciting its employees to work for another employer.

## BRIAN MOORE'S ABRUPT RESIGNATION FROM THE COMPANY

11. On or about November 18, 2022, while I was in London on a business trip, I received news that B. Moore had resigned from his position. I also received and read B. Moore's resignation letter. A true and accurate copy of this letter is

attached as Exhibit 2.

12.     The news of B. Moore's resignation took me completely by surprise as I had spoken to B. Moore several times that same day, and he never mentioned his plans to resign. Even prior to that day, B. Moore had never made any comments or references that would indicate to me that he was looking to leave the Company and pursue another opportunity. In fact, HMNY had just increased his salary.

13.     After B. Moore submitted his resignation, I met with him several times before his last day of work to see if there was anything HMNY could offer him that would change his mind about his resignation. During these meetings, B. Moore was somewhat guarded about his reasons for leaving the Company and about the identity of his new employer. Instead, B. Moore simply told me that he was leaving to work for a "tugboat" business, but that it was not, in his opinion, a "direct competitor" of HMNY. He did not share with me what his new job title would be for this new employer.

14.     Although B. Moore was scheduled to work for HMNY up until December 2, 2022, his last day of work at the Company was November 30, 2022. A few days after his departure, I noticed through social media (via LinkedIn) that B. Moore had changed his current position as "General Manager" for Defendant Carver Companies d/b/a Carver Marine Towing ("Carver").

## DEFENDANT MOORE'S RECRUITMENT AND SOLICITATION OF HMNY EMPLOYEES

15. Soon after his departure, I discovered that B. Moore was actively recruiting certain key employees of HMNY. Specifically, I learned that he recruited and solicited Joseph Stevenson, Leonard Baldassare, and Dylan Galm to leave the Company and work for B. Moore's new employer, Defendant Carver.

16. Mr. Stevenson began working for HMNY the same year as B. Moore. He was initially hired to work as a Warehouse Operations Assistant and was later promoted to Deckhand. During his employment, Mr. Stevenson worked closely with Mr. B. Moore.

17. Baldassare began working for HMNY in 2019 as an Assistant Port Captain. He was eventually promoted to Senior Port Captain, and worked alongside B. Moore, who was also his direct supervisor.

18. Galm has been with HMNY since January 2017—well before B. Moore began his employment with the Company. Initially, Galm was hired to work as a Barge Mate. Throughout his employment, Galm was given many opportunities to learn more about the business from an operational side. Eventually, the experience he gained at HMNY led him to be promoted within the Company to the position of Marketing and Logistics Manager. In that role, Galm had significant interfacing with HMNY's customers.

19. On December 14, 2022, Stevenson resigned from his position as Deck

Hand. On or around that same day, he came to my office to let me know that he was resigning from HMNY. He told me that B. Moore "had <u>asked him</u> to come work for him at Carver," and that he did not want to pass up the opportunity. I wished him luck on his new job, though I was troubled by the fact that B. Moore had directly asked Stevenson to work for him. B. Moore knows all too well that recruiting and retaining experienced mariners is a significant challenge in our industry, and it was deeply concerning that he would so blatantly solicit one of our Deckhands to work for another maritime business.

20. On or about January 16, 2023, I learned Galm had submitted his notice of resignation. Based on conversations with the Company's President and CEO, Matthew Godden, my understanding was that Galm was also leaving to go work for Defendant Carver.

21. A day later, on January 17, 2023, Baldassare also submitted his written resignation via e-mail to me and to other HMNY executives. A true and accurate copy of this resignation e-mail is attached as Exhibit 3.

22. Shortly before he sent his resignation e-mail, Baldassare let me know in advance that he was resigning from his position. Again, I was surprised and disappointed with the news. He further told me that he had talked to "Brian" and was leaving to go work with him at Carver.

23. On January 19, 2023, I met with Baldassare at the Bayonne Office to

6

talk about his reasons for leaving his job and if there was anything the Company could offer to change his mind. During the conversation, Baldassare mentioned having conversation with "Brian." At one point, I asked Baldassare to "help me understand what Brian was able to offer him that [HMNY] was not able to offer him." At first, Baldassare avoided the question and simply responded that he had no complaints about his employment with HMNY and he was grateful for the opportunities he was given. I asked him again what "Brian" specifically offered him—whether it be more money or benefits. In response, Baldassare said that "Brian" was offering him a better work-life balance.

24.     Additionally, Baldassare told me that he did not have to work from Carver's offices in Albany, New York (a four-hour commute) because "Brian" arranged for him to work out of an office in Caddell's Shipyard in Staten Island, New York (an 1.5 hour away from his home in Babylon, New York).

25.     To my knowledge, Carver (or any of its affiliated companies) has never had any offices in Caddell's Shipyard prior to B. Moore's departure in December 2022. It was clear to me that B. Moore and Carver arranged for Baldassare to work from Staten Island solely to entice him away from his job at HMNY.

26.     At this point, it became evident to me that B. Moore was actively soliciting and recruiting away key employees from HMNY.

27.     The departure of Baldassare is particularly devastating for the

Company. His experience and skillset were critical in the training and development of HMNY's marine personnel. Additionally, Baldassare had significant influence in the development of HMNY's company operations and procedures. In fact, B. Moore and Baldassare were <u>the</u> decisionmakers on the day-to-day operational issues for HMNY's East Coast operations. In their respective positions, both men were also privy to highly confidential conversations and communications regarding HMNY's finances.

28.     Galm's departure is similarly devastating to HMNY.  For the past four years, Galm was considered to be HMNY's point person for all contract negotiations and potential customer opportunities. Indeed, each month, Galm was responsible for handling several million dollars of HMNY's business revenues. In addition to having important financial functions for HMNY, a major aspect of Galm's role was also to check on <u>competitive activity</u> and to develop new methods for capturing market shares from competitors and to develop new methods to obtain new contracts or accounts.

### BRIAN MOORE'S UNAUTHORIZED ACCESS AND DOWNLOAD OF HMNY'S CONFIDENTIAL INFORMATION

29.     HMNY uses a variety of different computer programs and online software to conduct its business, including Dropbox, which is a file hosting service that offers cloud storage for documents and file synchronization.

30.     HMNY's Operations and Marketing/Sales teams use Dropbox to save,

transfer, and access files pertaining to HMNY's fleet or business-related information. In Dropbox, the Company also maintains a folder for each of its vessels and tugboats, which contains documents relating to engineering specifications, regulatory requirements, certifications, and other similar documents.

31. In addition, HMNY uses Dropbox to store confidential business information, including highly sensitive financial documents. Only certain HMNY employees have access the Dropbox account. However, not everyone with access to the Dropbox account has access to <u>all</u> the files on the account. Instead, an employee's access to Dropbox depends on their job title. It is my understanding that—because of his job title as Director—B. Moore had access to all documentation kept in Dropbox, including highly sensitive financial information.

32. Soon after my conversation with Baldassare, I learned from Godden that B. Moore had accessed HMNY's Dropbox account and downloaded certain documents without any authorization from the Company and well <u>after his employment with the Company ended</u>. Specifically, he had logged in, accessed and downloaded documents on three separate days: December 18, December 30, and January 5, 2023. On those dates, B. Moore had already begun working for Carver.

33. I reviewed the "Dropbox Activity Log" (attached as Exhibit 2 to Godden's Declaration) that Godden obtained from the Company's Dropbox account. Based on my review, B. Moore downloaded documents pertaining to the Company's

9

tugboats, including: the (i) Jillian Irene, (ii) William Fallon Jr.; (iii) Thunder; (iv) Lightning; (v) Andrea; and (vi) Raymond Butler.

34. From what I can decipher from the filename extension listed in the Dropbox Activity Log, B. Moore accessed—without authorization—the following information pertaining to one or more of the above-listed tugboats: (1) Stability Letters regarding each tugboat's seaworthiness; (ii) "Blue Cards" from the Company's insurance carrier in London, U.K.; (iii) Bridge Letters showing the various corporate entities who own each vessel; (iv) equipment list for each vessel; and (v) "spec sheets" showing operating and mechanical data for each tug boat such as: fuel capacity, fluid density, flow rate, and operating pressure and temperature.

35. The compilation of this information includes confidential information not accessible in the public realm.

36. Moreover, this type of information would be highly valuable for a competitor or a business trying to compete with HMNY, such as Carver, because it would provide a blueprint on how to build a fleet that would compete with HMNY's. Indeed, based on my knowledge of Carver's business, Carver offers similar services as HMNY with respect to the use of tugboats, such as "tug and barge" (inland and offshore towing) and ship assists.

37. With the information B. Moore stole while employed by Carver, together with the knowledge they obtained while working for HMNY, B. Moore,

Baldassare and Galm would together have the requisite knowledge, information, and business contacts to build a business line that can compete with HMNY.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 7, 2023.

_____
KELLY MOORE