## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

HARLEY MARINE NY, INC.,

                Plaintiffs,

v.

BRIAN MOORE,
CARVER COMPANIES,

                Defendants.

CIVIL ACTION
CASE NO. 1:23-cv-00163-AMN-CFH

## DECLARATION OF MATTHEW GODDEN

I, **Matthew Godden**, hereby declare as follows:

1.      I am the President, Chief Executive Officer, Chief Operating Officer and Secretary of Centerline Logistics Corporation ("Centerline").

2.      I am over the age of 21 and fully competent to make this Declaration. I have personal knowledge of all the facts in this Declaration.

### THE BUSINESS OF HMNY

3.      I joined Centerline as a Senior Vice-President and Chief Operating Officer in 2015, and was promoted to CEO and President in 2019. I have over 20 years of experience in the marine industry.

4.      Centerline is the sole owner and member of Harley Marine NY, Inc. ("HMNY" or "the Company"). As such, I have direct and personal knowledge of the business operations of HMNY.

5.      HMNY is primarily in the petroleum marine transportation business. The Company operates a large and diverse fleet—including barges and tugboats. HMNY operates in the East and Gulf Coasts of the United States.

6.      However, Centerline offers its customers a wide range of services beyond that of the transportation of petroleum, such as: (i) terminal transportation; (ii) ship assists and escort; (iii) rescue and general towing; and (iv) freight barge transportation.

## BRIAN MOORE'S RESIGNATION

7.      On November 18, 2022, Brian Moore ("B. Moore"), HMNY's Director of U.S. East Operations, sent a letter of resignation to the Company's Executive Team, in which he stated his last day with the Company would be December 2, 2022. He expressed feeling "forever grateful" for all the support provided to him in the past five years and "all the valuable experiences" he gained while working for the Company.

8.      I later learned from B. Moore's supervisor, Kelly Moore, (Senior Vice President of East & Gulf Operations), that B. Moore was leaving the Company to work for Defendant Carver Companies d/b/a Carver Marine Towing ("Carver"). Both Kelly Moore and I were surprised by B. Moore's sudden resignation.

9.      On or about December 1, the Company mailed B. Moore a "termination package," in which he was reminded of his legal obligations arising from the

Confidentiality Agreement that he signed upon his hiring. A full copy of the Confidentiality Agreement was enclosed with this letter. Specifically, this letter reminded B. Moore to "please understand the terms of the [Confidential] agreement still apply." A copy of this termination letter (without enclosures) is attached here as Exhibit 1.

10.    The Confidentiality Agreement also contained a Non-Solicitation clause in which B. Moore agreed not to directly or indirectly "solicit, induce or otherwise persuade employees to leave the Company to work with… a third party."

11.    Despite being reminded of his legal obligations, I later learned that B. Moore was actively recruiting and soliciting HMNY employees.

12.    Less than two weeks after B. Moore's departure, Joseph Stevenson, a Deckhand for HMNY, resigned from his position. Kelly Moore then informed me that B. Moore had asked Stevenson to come work with B. Moore at Carver.

13.    On January 16, 2023, I received a call from Dylan Galm, the Company's Marketing and Logistics Manager. During this call, Galm told me that he had received another job offer that he felt he needed to pursue for his family. Galm also assured me that he was not seeking this opportunity, but that the opportunity came to him. When he told me about the job offer, I responded by telling him that "I can't make you stay," but that we should further discuss if this new opportunity would be a right fit for him. Galm seemed reluctant to tell me about the job offer. Ultimately,

Galm stated, "I have to be honest with you, I am leaving to go work with Brian [Moore] at Carver." According to Galm, B. Moore assured him that working at Carver would allow him to spend more time with his family. Galm also told me that "Brian was [his] Captain," referring to the close relationship he had with B. Moore.

14.    At no point during our entire call did Galm mention that anyone else at Carver—other than B. Moore—had spoken to him about working at Carver.

15.    Soon after this call, Galm sent a resignation letter to the Company's Executive Team. Mr. Galm's resignation letter was gracious, and he thanked the Company for giving the ability to "gain invaluable experience while wearing many hats during [his] time at [the Company] from sailing, operations, and chartering." Galm also stated that he will be "forever grateful" for his time at the Company. A copy of Galm's resignation letter is attached as Exhibit 2.

16.    It was clear to me that B. Moore had gone through great lengths to convince one of our most valued employees to leave his position with the Company. However, he had not stopped there. The day after Galm resigned, on January 17, 2023, one of the Company's Senior Port Captains, Leonard Baldassare, also resigned from his position. Baldassare sent a resignation e-mail to the Company's Executive Team, in which he also mentioned feeling "forever grateful" to the Company, but that he had to "pursue another opportunity." A couple of days later, Kelly Moore informed me that B. Moore had spoken to Baldassare and also convinced him to

resign and go work with him at Carver.

17.    B. Moore had been reminded of the terms of the Confidentiality Agreement immediately after his departure from the Company, so he knew he was bound by a Non-Solicitation Clause. Yet, he still actively recruited at least three (3) HMNY employees.

## B. MOORE'S THEFT OF COMPANY INFORMATION

18.    Given B. Moore's blatant and intentional violations of the Non-Solicitation clause, I decided to further investigate B. Moore's last activities before leaving the Company. On January 19, 2023, I checked the "Activity Log" of HMNY's Dropbox account, which provides the following data: (i) the employee's username; (ii) the type of activity performed while logged in (e.g. downloads, transfer of file); (iii) the device used to log-in to the account (desktop v. mobile); (iv) the location where the employee member logged in to the account; and (v) the filename extension which indicates the nature of the document viewed or downloaded.

19.    When I checked the Dropbox Activity Log, I filtered the data by date—from January 2022 through the present (January 2023)—and filtered to only show B. Moore's member username: bmoore@harleymarine.com. To my dismay, the Dropbox Activity Log revealed that B. Moore had logged in HMNY's Dropbox account well _after_ he left the Company. Specifically, B. Moore logged in to HMNY's Dropbox on the following dates: (i) December 18, 2022; (ii) December 30, 2022;

and (iii) January 5, 2023.  A true and accurate copy of this Dropbox Activity Log is attached as Exhibit 3.

20.    Although B. Moore's employment officially ended on December 2, 2022, his last day of work was November 30, 2022. Keeping with Company protocol intended to protect its confidential and proprietary information, his access to the Company's electronic accounts and programs was terminated. However, due to an administrative oversight, B. Moore's Dropbox account had not been deactivated. Immediately after discovering this oversight, I instructed the Company's IT Department to deactivate B. Moore's Dropbox account.

21.    Kelly Moore and I closely reviewed the Dropbox Activity Log. We determined that B. Moore had accessed and downloaded various files regarding our Company's tugboats—specifically "push boats," including "equipment lists" that show the types of equipment and tools that our vessels carry and spec sheets that reveal mechanical and operational data of each of our Company's vessel.

22.    Such information pertaining to our push boats can certainly be valuable to a business looking to compete in the petroleum marine transportation industry. Although businesses in the East and West Coast markets have historically used "model bow ocean going" vessels to transport petroleum, HMNY has opted to instead utilize push boats to transport petroleum because of their overall simplicity, lower cost of capital, and their ability to perform the same level of work in harbor

operations for bunkering. Indeed, the Company has spent considerable effort retrofitting its equipment and policies to support and operate these vessels in manner that has been both financially viable and profitable for the Company. As the Company's former Director of Operations, B. Moore was well-aware of this business model.

23.    The tugboat information that B. Moore stole from HMNY, would allow him to replicate HMNY's operations and to formulate a cost-effective plan to move either petroleum or non-petroleum barges.

24.    Carver's and B. Moore's intent to unfairly compete with HMNY is made clearer when considering Carver's decision to hire Galm, who spent the past few years at HMNY developing significant and meaningful client relationships and contacts. Galm's experience and knowledge in this industry would be extremely valuable to any business trying to cross over into the petroleum transportation business and to unfairly compete in other lines of business that overlap with HMNY.

25.    In addition to information regarding the Company's vessels,  I also was alarmed by the fact that the first document B. Moore accessed and downloaded was HMNY's "Master Voyage Economics2.Numbers" ("Master Voyage"). This document is a pricing and bidding sheet with information based on <u>internal knowledge</u> that HMNY has accumulated over the last two decades, including but not limited to: (1) vessel details and particulars (*i.e.* capacity and speed); (ii) voyage runs

and distances traveled; (iii) specific routes that can be operated safely; (iv) day rates of equipment; and (v) expenses for consumables. This type of information is plugged in a spreadsheet application, which then calculates and converts this information into a "day rate," for each vessel. The day rate is a metric that HMNY uses to determine its price rates for existing and new customers and profitability or financial viability of those rates.

26.    The data and information contained in the "Master Voyage" spreadsheet is not publicly available and is considered highly confidential. In fact, only few employees working for HMNY have access to this information—(i) the Sales and Charter Team, which includes Dylan Galm; (ii) the Executive Team (including myself and Kelly Moore); and (iii) Directors of Operations, which included B. Moore.

27.    The information contained in the "Master Voyage" document could be used to compete and bid against HMNY in potential customer contracts. Without question, B. Moore's unauthorized access and download of HMNY confidential information is an egregious violation of his Confidentiality Agreement, which forbids him from using such information for purposes other than his employment with the Company and requires him to return and/or destroy any Company information at end of his employment.

28.    In this case, B. Moore accessed and downloaded the Company's

information _weeks_ after his employment with HMNY had ended and _while_ he was working for Carver—another business that provides a variety of tugboat services. The Dropbox Activity Log shows that B. Moore accessed HMNY's information using a mobile device from two locations—Kingston and Buffalo, New York. Based on our employment records, B. Moore resides in Kingston, New York, and based on an online search, Carver maintains an office in Buffalo, New York. Given that HMNY does not have any presence in either Kingston and Buffalo, we can easily deduce that B. Moore was wrongfully accessing and downloading HMNY's information from his home and while working from his new employer's offices. B. Moore's access and use of this information was completely unauthorized and prohibited.

## HMNY SENDS CEASE-AND-DESIST LETTER TO DEFENDANTS

29.    On January 20, 2023, I instructed our legal counsel to send a cease-and-desist letter to both Defendants. A true and accurate copy of this letter is attached as Exhibit 4. In this letter, we disclosed our discovery of B. Moore's wrongful solicitation of HMNY employees as well as his theft of Company information.

30.    On January 23, 2023, HMNY's legal counsel received a response from B. Moore. A true and accurate copy of his response is attached as Exhibit 5. Therein, B. Moore disingenuously denied taking any information belonging to HMNY other than one document titled "HMS Liberty," which he claims he inadvertently took with

him. He denied accessing HMNY's Dropbox account and stated that he had returned HMNY's laptop and his work phone on the last day of employment, so he "cannot account for the log-in after [his] departure." However, the fact that B. Moore had turned over his HMNY work equipment is irrelevant because it would not stop his ability to access the Company's Dropbox account. According to the Dropbox Activity Log, B. Moore very likely used his personal mobile device to access the Dropbox website and using his former HMNY username and password credentials.

31.    Notably, in his response letter, B. Moore did not deny talking to or recruiting HMNY employees. Instead, he simply stated that the departure of Galm, Stevenson, and Baldassare were not "initiated by [him]." Essentially, he admits that he played a role in soliciting and encouraging the departure of these employees. Whether B. Moore "initiated" the solicitation or recruitment of HMNY's employees is beside the point. The Non-Solicitation clause prohibits any form of recruitment of Company employees regardless of who initiated the first contact.

32.    With respect to Carver, we received a written response from Carver's attorney on January 30, 2023. In this letter, Carver denied any knowledge of B. Moore's solicitation of HMNY employees and further denied any knowledge of B. Moore's wrongful and unauthorized access and retention of the Company's confidential and proprietary information.

33.    However, the following day, Galm informed me that Carver had rescinded

his offer of employment. On February 1, 2023, Baldassare informed me that his job had been "suspended."

34.    Upon learning this information, the Company's legal counsel reached out Carver's attorney and confirmed that Carver decided to rescind the job offers for Baldassare and Galm on its own accord. As shown in the Company's cease-and-desist letters (Exhibit 4), no one at either HMNY or Centerline has ever requested or demanded that Carver rescind the job offers for Galm and Baldassare.

35.    After their job offers at Carver were rescinded, HMNY offered Galm and Baldassare the opportunity to remain employed with the Company. Both of them have refused this offer.

36.    As of the date of this Declaration, Galm and Baldassare are no longer employed with the Company.

I declare under penalty of perjury that the following is true and correct.

Executed on February  6 , 2023.

Matthew Godden

**EXHIBIT 1**

# CENTERLINE

## LOGISTICS
### HARLEY MARINE NEW YORK,
### A CENTERLINE LOGISTICS COMPANY

November 30, 2022

Brian Moore
7 Fairview Ave
Kingston, NY 12401

Re: Confirmation of Resignation

Dear Brian,

This letter acknowledges and accepts your voluntary resignation from Harley Marine New York (HMNY), effective November 30, 2022.

You will receive a final check, less any applicable payroll deductions, on the December 7, 2022 pay date. All your medical, dental, vision, long term disability insurance, and company paid life and AD&D benefits will end on November 30, 2022.

An application and instructions for either porting and/or converting your Employer Paid Basic Life insurance are included with this letter for your reference.

Regence Group Administrators (RGA) will mail you information regarding COBRA benefits where you will have the option to continue your medical, dental, and vision insurance for you and your dependents for up to 18 months.

The Principal Financial Group will contact you regarding your 401(k) account. If you are registered on www.principal.com, you may need to access the information there. A flyer with additional information regarding the options that are available is enclosed. You may contact them directly at 800-547-7754 if you have any questions.

This letter contains a copy of the Confidentiality Agreement you received and acknowledged on February 6, 2018. Although employment has ended, please understand the terms of the agreement still apply.

We wish you success in your future endeavors. If you have any questions or concerns, please do not hesitate to contact us.

Sincerely,

**Jennifer Johnson**
HR Specialist
Centerline Logistics
Phone: (206) 209-4394

Enclosures:
Instructions for Claiming Unemployment Benefits

**EXHIBIT 2**



January 16th, 2023

Dear Matt,

Please use this as my formal resignation from Centerline Logistics Corp. as Commercial & Logistics Manager USEC/USGC. My last day will be January 31st, 2023 or at a later date if needed. I appreciate the opportunity Centerline has provided to me during the nearly 6 years working both at sea and shoreside. I was able to gain invaluable experience while wearing many hats during my time at HMNY from sailing, operations, and chartering.

While I might not have been someone you handpicked out of ICIMS to run your East/Gulf Coasts Sales & Chartering at HMNY, I am sure glad the opportunity presented itself and you had the belief in me. These past few years have been the biggest challenge of my life. The long days, sleepless nights and time spent away from my family were well worth it because of all the relationships that I was lucky enough to make along the way.

I will continue to work and transition my responsibility to whomever the upper management chooses in the coming weeks. All the charters will be shared and in order on dropbox along with a simplified spreadsheet to make sure nothing is missed in my absence. I will ensure all my open opportunities that are not in dropbox are properly handed off and that all future business for Centerline will continue.

I will miss the entire team and many people here at Centerline. This was the toughest decision I have ever had to make, and I had to choose what is best for my family. I wish everyone continued successes at Centerline . Thank you, I will be forever grateful for my time at Centerline.

Best Regards,

Dylan Galm                Phone#: 845-853-3726                Email: DylanGalm@Gmail.com

**EXHIBIT 3**

**EXHIBIT 4**



Jeffrey Kimmel

Akerman LLP
1251 Avenue of the Americas
37th Floor
New York, NY  10020

D: 212 259 6435
T: 212 880 3800
F: 212 880 8965
DirF: 212 905 6408
jeffrey.kimmel@akerman.com

January 20, 2023

**VIA USPS EXPRESS MAIL AND EMAIL**

Thomas Marron                              Carver Laraway
Chief Human Resources Officer              President
CARVER COMPANIES                           CARVER COMPANIES
2170 River Road                            2170 River Road
PO BOX 890                                 PO BOX 890
Coeymans, NY 12045                         Coeymans, NY 12045
Email: tmarron@carvercompanies.com         Email: claraway@carvercompanies.com

**Re:    Brian Moore's Unlawful Misappropriation of Harley Marine NY's Confidential Information**

Dear Mr. Marron & Mr. Laraway:

  This firm, represents Harley Marine NY, Inc. (the "Company"), the former employer of Mr. Brian Moore ("Mr. Moore"), who is a current employee of Carver Companies ("Carver"). The purpose of this letter is to place you on notice regarding claims arising out of Mr. Moore's evident misappropriation of the Company's confidential and proprietary information and to request that you cease any continuing or future uses of this information.  Enclosed with this letter is the cease and desist letter sent to Mr. Moore.

  We understand that Carver recently hired Mr. Moore, a former employee of the Company. Mr. Moore is bound by a Confidentiality Agreement ("Agreement") he signed in connection with his employment with the Company. The Company has recently uncovered information that shows that Mr. Moore illegally accessed and misappropriated the Company's Confidential Information on approximately thirty (30) separate occasions *after* the cessation of his employment with the Company and while he was employed by Carver. These unlawful and acts are in express violation of the Company's policies and the Agreement which provides that:

  **1. Trade Secrets and Confidential Information.**  Employee recognizes and agrees that he/she shall treat as confidential and proprietary all aspects of the Employer's business that is not

generally known to the public including, but not limited to, customer identities and information, rates charged/billed, services performed, contract terms, the history of the relationship between the Employer and its customers, and the identity of customers' contracting agencies; pricing information; sales information; prospect lists; policy manuals; procedure manuals and techniques; business financial data and records; staffing, organizational structures and compensation/benefit programs, to include employment contracts; information programs and systems; information relating to any pending or potential future litigation, to include investigations by any federal or state agencies or other regulatory agencies; training techniques; and all other forms of technical and proprietary information which was developed by the Employer. Employee also agrees never, directly or indirectly, to use, disseminate, disclose, or otherwise reveal any such information or material to any person, firm, corporation, association, or other entity doing, or planning to do, business in competition with the Employer for any reason or purpose whatsoever without the prior written consent of the Employer.

**2. Property of the Employer**. Employee agrees that the originals and copies of all files, records, lists, specifications, documents, equipment and software, whether prepared by the Employer or a product of other employees, are and shall remain the exclusive property of the Employer. The above mentioned information will not be used or retained by the Employee except in the course of employment by the Employer. Upon termination of employment or at the request of the Employer at any time, all such items in the possession of the Employee shall be returned to the Employer.

**4. Confidentiality Obligations Continue After Employment Ends**. Employee understands and acknowledges that his or her obligations under this Agreement with regard to any particular Confidential Information shall commence immediately upon the Employee first having access to such Confidential Information, whether before or after he or she begins employment by the Employer, and shall continue during and after his or her employment by the Employer until such time as such Confidential Information has become public knowledge other than as a result of the Employee's breach of this Agreement or breach by those acting in concert with the Employee or on the Employee's behalf.

The foregoing clearly prohibits misappropriating the Company's property and Confidential Information as Mr. Moore has evidently done so here. Not only were Mr. Moore's actions in direct contravention of the Agreement but also his continuing common law obligations to the Company.

The Agreement also provides that:

> **12. Non-Solicitation**. Employee agrees they will not directly or indirectly solicit, induce, or otherwise persuade employees to leave HMS to work for or with Employee or a third party.

In violation of this provision Mr. Moore has solicited at least three (3) employees of the Company to resign their employment with the Company and take employment with Carver.

Carver is hereby on notice of Mr. Moore's unlawful actions and that such actions were likely done in connection with Mr. Moore's employment with Carver and for the benefit of Carver.

**Accordingly, the Company demands that Carver investigate this matter and immediately prohibit Mr. Moore from engaging in any activities in competition with the Company or that in any way utilize the Company's misappropriated Confidential Information or otherwise violate the Agreement, including direct or indirect solicitation of Company employees, and that Carver refrain from using any Confidential Information obtained from Mr. Moore**.

**We also ask that a representative of Carver contact the undersigned by no later than 5:00 p.m. on Tuesday, January 24, 2023 to discuss resolution of this matter**.

If we do not hear from you by the above-referenced date, we will assume that you do not wish to resolve this matter amicably, and we will respond accordingly. This may include the initiation of a lawsuit against Carver, for claims including, but not limited to, misappropriation of trade secrets, seeking all available remedies under the law or in equity, including monetary damages, injunctive relief, attorneys' fees and costs. We hope that this will not be necessary, but be advised that the Company is prepared to move forward if you do not timely respond and carry through with its demands.

This letter is not a complete statement of the Company's rights in connection with this matter and nothing herein shall constitute or be deemed a waiver, estoppel, admission, or prejudice of any kind to our client's rights and defenses under the law or otherwise. All rights are reserved.

Lastly, given the strong likelihood of litigation, until a resolution is reached, Carver is hereby placed on notice to preserve all potential and actual evidence related to the above-claims. **Specifically, Carver must not destroy, delete, modify or discard any documents, e-mail messages, files or information, in electronic, paper or any form of media, related to this dispute on any computer.** If you choose to do otherwise, the Company will treat this matter with the utmost seriousness and will seek any and all available civil remedies and sanctions.

**PLEASE GOVERN YOURSELF ACCORDINGLY.**

Sincerely,
**AKERMAN LLP**

*/s/ Jeffrey Kimmel*

Jeffrey Kimmel

Encl.



Jeffrey Kimmel

Akerman LLP
1251 Avenue of the Americas
37th Floor
New York, NY  10020

D: 212 259 6435
T: 212 880 3800
F: 212 880 8965
DirF: 212 905 6408
jeffrey.kimmel@akerman.com

January 20, 2023

**VIA FEDEX AND E-MAIL (brianbmoore13@gmail.com)**

Mr. Brian Moore
7 Fairview Avenue
Kingston, NY 12401
United States

Re:     **Breach of Your Confidentiality and Non-Solicitation Obligations to Harley Marine NY**

Dear Mr. Moore:

Please be aware that this firm, Akerman LLP, represents your former employer Harley Marine NY, Inc. (the "Company"). This letter serves as notice that you are to immediately cease and desist from using or disclosing any Confidential Information that you have illegally and unethically obtained from the Company. This letter further serves as notice that you are to immediately cease and desist from any activities that interfere with the relationship between the Company and its employees.

It has come to our attention that for several weeks after you were no longer employed by the Company, you repeatedly unlawfully accessed the Company's computer systems and violated your continuing contractual obligations by illegally downloading via Dropbox the Company's Confidential Information. This occurred on at least thirty (30) separate occasions. You accessed and took at approximately 200 separate Company electronic files evidently in furtherance of your employment with your current employer Carver Industries ("Carver").

As you are aware, at the time of your hire, you received and agreed to a Confidentiality Agreement (the "Agreement"), which sets forth the Company's policies regarding the Company's property and Confidential Information.

Specifically, the Agreement states:

**1. Trade Secrets and Confidential Information.** Employee recognizes and agrees that he/she shall treat as confidential and proprietary all aspects of the Employer's business that is not

generally known to the public including, but not limited to, customer identities and information, rates charged/billed, services performed, contract terms, the history of the relationship between the Employer and its customers, and the identity of customers' contracting agencies; pricing information; sales information; prospect lists; policy manuals; procedure manuals and techniques; business financial data and records; staffing, organizational structures and compensation/benefit programs, to include employment contracts; information programs and systems; information relating to any pending or potential future litigation, to include investigations by any federal or state agencies or other regulatory agencies; training techniques; and all other forms of technical and proprietary information which was developed by the Employer. Employee also agrees never, directly or indirectly, to use, disseminate, disclose, or otherwise reveal any such information or material to any person, firm, corporation, association, or other entity doing, or planning to do, business in competition with the Employer for any reason or purpose whatsoever without the prior written consent of the Employer.

**2. Property of the Employer**. Employee agrees that the originals and copies of all files, records, lists, specifications, documents, equipment and software, whether prepared by the Employer or a product of other employees, are and shall remain the exclusive property of the Employer. The above mentioned information will not be used or retained by the Employee except in the course of employment by the Employer. Upon termination of employment or at the request of the Employer at any time, all such items in the possession of the Employee shall be returned to the Employer.

**4. Confidentiality Obligations Continue After Employment Ends**. Employee understands and acknowledges that his or her obligations under this Agreement with regard to any particular Confidential Information shall commence immediately upon the Employee first having access to such Confidential Information, whether before or after he or she begins employment by the Employer, and shall continue during and after his or her employment by the Employer until such time as such Confidential Information has become public knowledge other than as a result of the Employee's breach of this Agreement or breach by those acting in concert with the Employee or on the Employee's behalf.

There is no question that the Agreement prohibits misappropriating the Company's property and Confidential Information as you have evidently done. Not only are your actions in direct contravention of the Agreement and your continuing obligations to the Company, but likely constitute violations of criminal law.

Moreover, you further sought to injure the Company by contacting Company Employees Leonard Baldassare, Dylan Galm, and Joe Stevenson to induce them to end their employment relationships with the Company and become employees of Carver. This was a blatant attempt to disrupt the Company's business operations and to tortiously interfere with its relationships with its employees.  Such actions also violate your obligations as set forth below:

> **12. Non-Solicitation**. Employee agrees they will not directly or indirectly solicit, induce, or otherwise persuade employees to leave HMS to work for or with Employee or a third party.

The foregoing clearly prohibits you from soliciting employees to leave the Company to work for another employer, even after your separation with the Company.

You hereby are on notice that the Company will be taking all action necessary to protect its rights.  Nevertheless, we demand that you take the following actions:

1.  Immediately cease and desist from all activities in violation of the Agreement, including but not limited to disclosure of the Company's Confidential Information to Carver and contacting Company Employees to induce them to end their employment relationships with the Company and become employees of Carver;

2.  Account for every single Company document, file, message, record, or any other information and/or data you misappropriated and retained after the cessation of your employment with the Company on December 2, 2022 by creating a list of such items;

3.  **By Monday, January 23, 2023, no later than 3:00 p.m., provide to the undersigned the list of the items referenced above and confirm in a signed writing that you have accounted for all such items and returned all versions electronic of Company information and property to the undersigned.**

If you fail to comply with this demand, we will assume that you do not wish to resolve this matter, and we will respond accordingly by taking all steps necessary to protect the Company's legal rights under the Agreement and at law.  This may include the initiation of a lawsuit against you and/or your employer, for claims including, but not limited to, breach of contract and tortious interference with business relations, seeking all available remedies under the law or in equity, including monetary damages, injunctive relief, attorneys' fees and costs.

This letter is not a complete statement of the Company's rights in connection with this matter and nothing herein shall constitute or be deemed a waiver, estoppel, admission, or prejudice of any kind to our client's rights and defenses under the law or otherwise.  This reservation of rights includes, but is not limited to, any prior violation of the Agreement that the Company now, or later determines, has occurred.  All rights are reserved.

Lastly, given the strong likelihood of litigation as a result of your improper conduct, until a resolution is reached, you are hereby placed on notice to preserve all potential and actual

evidence related to the above-claims.  This includes electronic records of your activities, e-mail messages, text messages, files or information, in electronic, paper or any form of media, related to this dispute on any work or home computer.  If you choose to do otherwise, the Company will treat this matter with the utmost seriousness and will seek any and all available civil remedies and sanctions.

**PLEASE GOVERN YOURSELF ACCORDINGLY.**

Sincerely,

**AKERMAN LLP**

*/s/ Jeffrey Kimmel*

Jeffrey Kimmel

Encl.

Cc: Thomas Marron, Carver Companies

**Confidentiality Agreement**

As a condition to Employee's employment/continued employment with Harley Marine Services, Inc., its subsidiaries and/or affiliates, collectively referred to as the "Employer" and to receive the compensation package, assignments, training, introductions, and access to Employer's proprietary business information, and for other valuable consideration, including continued employment, the adequacy of which is hereby acknowledged Employee agrees to the following:

**1. Trade Secrets and Confidential Information**.  Employee recognizes and agrees that he/she shall treat as confidential and proprietary all aspects of the Employer's business that is not generally known to the public including, but not limited to, customer identities and information, rates charged/billed, services performed, contract terms, the history of the relationship between the Employer and its customers, and the identity of customers' contracting agencies; pricing information; sales information; prospect lists; policy manuals; procedure manuals and techniques; business financial data and records; staffing, organizational structures and compensation/benefit programs, to include employment contracts; information programs and systems; information relating to any pending or potential future litigation, to include investigations by any federal or state agencies or other regulatory agencies; training techniques; and all other forms of technical and proprietary information which was developed by the Employer.  Employee also agrees never, directly or indirectly, to use, disseminate, disclose, or otherwise reveal any such information or material to any person, firm, corporation, association, or other entity doing, or planning to do, business in competition with the Employer for any reason or purpose whatsoever without the prior written consent of the Employer.

**2. Property of the Employer**.  Employee agrees that the originals and copies of all files, records, lists, specifications, documents, equipment and software, whether prepared by the Employer or a product of other employees, are and shall remain the exclusive property of the Employer.  The above mentioned information will not be used or retained by the Employee except in the course of employment by the Employer.  Upon termination of employment or at the request of the Employer at any time, all such items in the possession of the Employee shall be returned to the Employer.

**3. Use of Trade Secrets and Confidential Information While Employed**. Employee understands that the Employer's proprietary and confidential information as described in Paragraphs 1 and 2, above, has considerable value to the Employer.  This information will be treated confidentially at all times and extreme care will be exercised in the custody, control and distribution of this material.  The loss of any of this information or unauthorized disclosure which may cause harm, directly or indirectly, to Employer's business and/or reputation is a violation of this policy which

could subject Employee to dismissal or legal actions to recover monetary damages.

**4.  Confidentiality Obligations Continue After Employment Ends**.  Employee understands and acknowledges that his or her obligations under this Agreement with regard to any particular Confidential Information shall commence immediately upon the Employee first having access to such Confidential Information, whether before or after he or she begins employment by the Employer, and shall continue during and after his or her employment by the Employer until such time as such Confidential Information has become public knowledge other than as a result of the Employee's breach of this Agreement or breach by those acting in concert with the Employee or on the Employee's behalf.

**5. Consent**.  Employee agrees that if any question arises during the course of his/her employment as to whether he/she has authority to release information to non-employees of the Employer, he/she will seek a clarification from his/her immediate supervisor before doing so.

**6. Severability**.  If any of the provisions of this Agreement are found by a court to be unreasonable, this Agreement may be reformed or modified by the court to make the restrictions reasonable under the circumstances.

**7. Remedies**.  In the event of a breach or imminent breach of any of the provisions of this Agreement, Employee agrees that the Employer shall be entitled to an injunction if warranted by law or equity, including a temporary restraining order and a preliminary injunction, restricting Employee from committing or continuing the breach/threatened breach.  In addition, Employer shall be entitled to any damages suffered by such breach.

**8. Attorneys' Fees**.  If a temporary, preliminary or permanent injunction is ordered by a court because Employee has violated the terms of this Agreement, or Employer is awarded damages for such breach, Employee agrees to reimburse Employer for all reasonable attorney fees and costs incurred in its effort to enforce this Agreement. Conversely, if Employer does not prevail in a breach of contract action seeking enforcement of this Agreement, it agrees to reimburse Employee for his/her reasonable attorney fees and costs of defending those actions.

**9. Forbearance**.  The failure of either party to this Agreement to insist upon the performance of any of the terms and conditions of this Agreement, or the waiver of any breach of any of the terms and conditions of this Agreement, shall not be con-strued as thereafter waiving any such terms and conditions, but the same shall continue and remain in full force and effect as if no such forbearance or waiving had occurred.

**10. Savings Clause**.  The invalidity of any portion of this Agreement will not and shall not be deemed to affect the validity of any other provision.  In the event that any provision is held to be invalid, the parties agree that the remaining portions shall be

deemed to be in full force and effect as if they had been executed by the parties subsequent to the expungement of the invalid provisions.

**11. Governing Law**.  This Agreement shall be governed by, construed and enforced in accordance with the laws of the state where I was physically employed by the Employer immediately after the signing of this Agreement.

**12. Non-Solicitation.** Employee agrees they will not directly or indirectly solicit, induce, or otherwise persuade employees to leave HMS to work for or with Employee or a third party.

☑ Signature
Brian Moore 2/6/2018 10:20 AM
(checking the checkbox above is equivalent to a handwritten signature)



Jeffrey Kimmel

Akerman LLP
1251 Avenue of the Americas
37th Floor
New York, NY  10020

D: 212 259 6435
T: 212 880 3800
F: 212 880 8965
DirF: 212 905 6408
jeffrey.kimmel@akerman.com

January 20, 2023

**VIA FEDEX AND E-MAIL (brianbmoore13@gmail.com)**

Mr. Brian Moore
7 Fairview Avenue
Kingston, NY 12401
United States

> Re:   **Breach of Your Confidentiality and Non-Solicitation Obligations to Harley Marine NY**

Dear Mr. Moore:

Please be aware that this firm, Akerman LLP, represents your former employer Harley Marine NY, Inc. (the "Company"). This letter serves as notice that you are to immediately cease and desist from using or disclosing any Confidential Information that you have illegally and unethically obtained from the Company. This letter further serves as notice that you are to immediately cease and desist from any activities that interfere with the relationship between the Company and its employees.

It has come to our attention that for several weeks after you were no longer employed by the Company, you repeatedly unlawfully accessed the Company's computer systems and violated your continuing contractual obligations by illegally downloading via Dropbox the Company's Confidential Information.  This occurred on at least thirty (30) separate occasions. You accessed and took at approximately 200 separate Company electronic files evidently in furtherance of your employment with your current employer Carver Industries ("Carver").

As you are aware, at the time of your hire, you received and agreed to a Confidentiality Agreement (the "Agreement"), which sets forth the Company's policies regarding the Company's property and Confidential Information.

Specifically, the Agreement states:

> **1.  Trade Secrets and Confidential Information.**  Employee recognizes and agrees that he/she shall treat as confidential and proprietary all aspects of the Employer's business that is not

generally known to the public including, but not limited to, customer identities and information, rates charged/billed, services performed, contract terms, the history of the relationship between the Employer and its customers, and the identity of customers' contracting agencies; pricing information; sales information; prospect lists; policy manuals; procedure manuals and techniques; business financial data and records; staffing, organizational structures and compensation/benefit programs, to include employment contracts; information programs and systems; information relating to any pending or potential future litigation, to include investigations by any federal or state agencies or other regulatory agencies; training techniques; and all other forms of technical and proprietary information which was developed by the Employer. Employee also agrees never, directly or indirectly, to use, disseminate, disclose, or otherwise reveal any such information or material to any person, firm, corporation, association, or other entity doing, or planning to do, business in competition with the Employer for any reason or purpose whatsoever without the prior written consent of the Employer.

**2. Property of the Employer**. Employee agrees that the originals and copies of all files, records, lists, specifications, documents, equipment and software, whether prepared by the Employer or a product of other employees, are and shall remain the exclusive property of the Employer. The above mentioned information will not be used or retained by the Employee except in the course of employment by the Employer. Upon termination of employment or at the request of the Employer at any time, all such items in the possession of the Employee shall be returned to the Employer.

**4. Confidentiality Obligations Continue After Employment Ends**. Employee understands and acknowledges that his or her obligations under this Agreement with regard to any particular Confidential Information shall commence immediately upon the Employee first having access to such Confidential Information, whether before or after he or she begins employment by the Employer, and shall continue during and after his or her employment by the Employer until such time as such Confidential Information has become public knowledge other than as a result of the Employee's breach of this Agreement or breach by those acting in concert with the Employee or on the Employee's behalf.

There is no question that the Agreement prohibits misappropriating the Company's property and Confidential Information as you have evidently done. Not only are your actions in direct contravention of the Agreement and your continuing obligations to the Company, but likely constitute violations of criminal law.

Moreover, you further sought to injure the Company by contacting Company Employees Leonard Baldassare, Dylan Galm, and Joe Stevenson to induce them to end their employment relationships with the Company and become employees of Carver. This was a blatant attempt to disrupt the Company's business operations and to tortiously interfere with its relationships with its employees. Such actions also violate your obligations as set forth below:

> **12. Non-Solicitation**. Employee agrees they will not directly or indirectly solicit, induce, or otherwise persuade employees to leave HMS to work for or with Employee or a third party.

The foregoing clearly prohibits you from soliciting employees to leave the Company to work for another employer, even after your separation with the Company.

You hereby are on notice that the Company will be taking all action necessary to protect its rights. Nevertheless, we demand that you take the following actions:

1. Immediately cease and desist from all activities in violation of the Agreement, including but not limited to disclosure of the Company's Confidential Information to Carver and contacting Company Employees to induce them to end their employment relationships with the Company and become employees of Carver;

2. Account for every single Company document, file, message, record, or any other information and/or data you misappropriated and retained after the cessation of your employment with the Company on December 2, 2022 by creating a list of such items;

3. **By Monday, January 23, 2023, no later than 3:00 p.m., provide to the undersigned the list of the items referenced above and confirm in a signed writing that you have accounted for all such items and returned all versions electronic of Company information and property to the undersigned.**

If you fail to comply with this demand, we will assume that you do not wish to resolve this matter, and we will respond accordingly by taking all steps necessary to protect the Company's legal rights under the Agreement and at law. This may include the initiation of a lawsuit against you and/or your employer, for claims including, but not limited to, breach of contract and tortious interference with business relations, seeking all available remedies under the law or in equity, including monetary damages, injunctive relief, attorneys' fees and costs.

This letter is not a complete statement of the Company's rights in connection with this matter and nothing herein shall constitute or be deemed a waiver, estoppel, admission, or prejudice of any kind to our client's rights and defenses under the law or otherwise. This reservation of rights includes, but is not limited to, any prior violation of the Agreement that the Company now, or later determines, has occurred. All rights are reserved.

Lastly, given the strong likelihood of litigation as a result of your improper conduct, until a resolution is reached, you are hereby placed on notice to preserve all potential and actual

evidence related to the above-claims.  This includes electronic records of your activities, e-mail messages, text messages, files or information, in electronic, paper or any form of media, related to this dispute on any work or home computer.  If you choose to do otherwise, the Company will treat this matter with the utmost seriousness and will seek any and all available civil remedies and sanctions.

**PLEASE GOVERN YOURSELF ACCORDINGLY.**

Sincerely,

**AKERMAN LLP**

*/s/ Jeffrey Kimmel*

Jeffrey Kimmel

Encl.

Cc: Thomas Marron, Carver Companies

**Confidentiality Agreement**

As a condition to Employee's employment/continued employment with Harley Marine Services, Inc., its subsidiaries and/or affiliates, collectively referred to as the "Employer" and to receive the compensation package, assignments, training, introductions, and access to Employer's proprietary business information, and for other valuable consideration, including continued employment, the adequacy of which is hereby acknowledged Employee agrees to the following:

**1. Trade Secrets and Confidential Information**.  Employee recognizes and agrees that he/she shall treat as confidential and proprietary all aspects of the Employer's business that is not generally known to the public including, but not limited to, customer identities and information, rates charged/billed, services performed, contract terms, the history of the relationship between the Employer and its customers, and the identity of customers' contracting agencies; pricing information; sales information; prospect lists; policy manuals; procedure manuals and techniques; business financial data and records; staffing, organizational structures and compensation/benefit programs, to include employment contracts; information programs and systems; information relating to any pending or potential future litigation, to include investigations by any federal or state agencies or other regulatory agencies; training techniques; and all other forms of technical and proprietary information which was developed by the Employer.  Employee also agrees never, directly or indirectly, to use, disseminate, disclose, or otherwise reveal any such information or material to any person, firm, corporation, association, or other entity doing, or planning to do, business in competition with the Employer for any reason or purpose whatsoever without the prior written consent of the Employer.

**2. Property of the Employer**.  Employee agrees that the originals and copies of all files, records, lists, specifications, documents, equipment and software, whether prepared by the Employer or a product of other employees, are and shall remain the exclusive property of the Employer.  The above mentioned information will not be used or retained by the Employee except in the course of employment by the Employer.  Upon termination of employment or at the request of the Employer at any time, all such items in the possession of the Employee shall be returned to the Employer.

**3. Use of Trade Secrets and Confidential Information While Employed**.
Employee understands that the Employer's proprietary and confidential information as described in Paragraphs 1 and 2, above, has considerable value to the Employer.  This information will be treated confidentially at all times and extreme care will be exercised in the custody, control and distribution of this material.  The loss of any of this information or unauthorized disclosure which may cause harm, directly or indirectly, to Employer's business and/or reputation is a violation of this policy which

could subject Employee to dismissal or legal actions to recover monetary damages.

**4. Confidentiality Obligations Continue After Employment Ends**.  Employee understands and acknowledges that his or her obligations under this Agreement with regard to any particular Confidential Information shall commence immediately upon the Employee first having access to such Confidential Information, whether before or after he or she begins employment by the Employer, and shall continue during and after his or her employment by the Employer until such time as such Confidential Information has become public knowledge other than as a result of the Employee's breach of this Agreement or breach by those acting in concert with the Employee or on the Employee's behalf.

**5. Consent**.  Employee agrees that if any question arises during the course of his/her employment as to whether he/she has authority to release information to non-employees of the Employer, he/she will seek a clarification from his/her immediate supervisor before doing so.

**6. Severability**.  If any of the provisions of this Agreement are found by a court to be unreasonable, this Agreement may be reformed or modified by the court to make the restrictions reasonable under the circumstances.

**7. Remedies**.  In the event of a breach or imminent breach of any of the provisions of this Agreement, Employee agrees that the Employer shall be entitled to an injunction if warranted by law or equity, including a temporary restraining order and a preliminary injunction, restricting Employee from committing or continuing the breach/threatened breach.  In addition, Employer shall be entitled to any damages suffered by such breach.

**8. Attorneys' Fees**.  If a temporary, preliminary or permanent injunction is ordered by a court because Employee has violated the terms of this Agreement, or Employer is awarded damages for such breach, Employee agrees to reimburse Employer for all reasonable attorney fees and costs incurred in its effort to enforce this Agreement. Conversely, if Employer does not prevail in a breach of contract action seeking enforcement of this Agreement, it agrees to reimburse Employee for his/her reasonable attorney fees and costs of defending those actions.

**9. Forbearance**.  The failure of either party to this Agreement to insist upon the performance of any of the terms and conditions of this Agreement, or the waiver of any breach of any of the terms and conditions of this Agreement, shall not be con-strued as thereafter waiving any such terms and conditions, but the same shall continue and remain in full force and effect as if no such forbearance or waiving had occurred.

**10. Savings Clause**.  The invalidity of any portion of this Agreement will not and shall not be deemed to affect the validity of any other provision.  In the event that any provision is held to be invalid, the parties agree that the remaining portions shall be

deemed to be in full force and effect as if they had been executed by the parties subsequent to the expungement of the invalid provisions.

**11. Governing Law**.  This Agreement shall be governed by, construed and enforced in accordance with the laws of the state where I was physically employed by the Employer immediately after the signing of this Agreement.

**12. Non-Solicitation.** Employee agrees they will not directly or indirectly solicit, induce, or otherwise persuade employees to leave HMS to work for or with Employee or a third party.

Signature
Brian Moore 2/6/2018 10:20 AM
(checking the checkbox above is equivalent to a handwritten signature)

**EXHIBIT 5**

**From:** Brian Moore <brianbmoore13@gmail.com>
**Sent:** Monday, January 23, 2023 9:22 AM
**To:** Smith, Hilary (LAA-NY) <hilary.smith@akerman.com>
**Cc:** Kimmel, Jeffrey (Ptnr-NY) <jeffrey.kimmel@akerman.com>
**Subject:** Re: C&D Letter

**[External to Akerman]**

Good Morning,

I acknowledge receipt of this cease and desist letter from your team and Harley Marine NY.  I have attached my signed and commented response via PDF so please let me know if you have troubles opening it.  I am more than willing to continue to adhere to the agreement and I am not willingly attempting to cause harm to Centerline Logistics or any divisions.

Please advise if any further action is required.  Thank you.

Regards,
Brian Moore

On Fri, Jan 20, 2023 at 12:05 PM <hilary.smith@akerman.com> wrote:

Good Afternoon Mr. Moore,

On behalf of Mr. Jeffrey Kimmel, please find attached correspondence dated January 20, 2023.

Thank you,

**Hilary T. Smith**

Legal Administrative Assistant

Akerman LLP | 1251 Avenue of the Americas, 37th Floor | New York, NY 10020

D: 212 259 8758 | F: 212 880 8965

hilary.smith@akerman.com

1

CONFIDENTIALITY NOTE: The information contained in this transmission may be privileged and confidential, and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.



Jeffrey Kimmel

Akerman LLP
1251 Avenue of the Americas
37th Floor
New York, NY  10020

D: 212 259 6435
T: 212 880 3800
F: 212 880 8965
DirF: 212 905 6408
jeffrey.kimmel@akerman.com

January 20, 2023

**VIA FEDEX AND E-MAIL (brianbmoore13@gmail.com)**

Mr. Brian Moore
7 Fairview Avenue
Kingston, NY 12401
United States

**Re:    Breach of Your Confidentiality and Non-Solicitation Obligations to Harley Marine NY**

Dear Mr. Moore:

Please be aware that this firm, Akerman LLP, represents your former employer Harley Marine NY, Inc. (the "Company"). This letter serves as notice that you are to immediately cease and desist from using or disclosing any Confidential Information that you have illegally and unethically obtained from the Company. This letter further serves as notice that you are to immediately cease and desist from any activities that interfere with the relationship between the Company and its employees.

It has come to our attention that for several weeks after you were no longer employed by the Company, you repeatedly unlawfully accessed the Company's computer systems and violated your continuing contractual obligations by illegally downloading via Dropbox the Company's Confidential Information.   This occurred on at least thirty (30) separate occasions. You accessed and took at approximately 200 separate Company electronic files evidently in furtherance of your employment with your current employer Carver Industries ("Carver").

As you are aware, at the time of your hire, you received and agreed to a Confidentiality Agreement (the "Agreement"), which sets forth the Company's policies regarding the Company's property and Confidential Information.

Specifically, the Agreement states:

**1. Trade Secrets and Confidential Information.**  Employee recognizes and agrees that he/she shall treat as confidential and proprietary all aspects of the Employer's business that is not

*B M*

generally known to the public including, but not limited to, customer identities and information, rates charged/billed, services performed, contract terms, the history of the relationship between the Employer and its customers, and the identity of customers' contracting agencies; pricing information; sales information; prospect lists; policy manuals; procedure manuals and techniques; business financial data and records; staffing, organizational structures and compensation/benefit programs, to include employment contracts; information programs and systems; information relating to any pending or potential future litigation, to include investigations by any federal or state agencies or other regulatory agencies; training techniques; and all other forms of technical and proprietary information which was developed by the Employer. Employee also agrees never, directly or indirectly, to use, disseminate, disclose, or otherwise reveal any such information or material to any person, firm, corporation, association, or other entity doing, or planning to do, business in competition with the Employer for any reason or purpose whatsoever without the prior written consent of the Employer.

**2. Property of the Employer**. Employee agrees that the originals and copies of all files, records, lists, specifications, documents, equipment and software, whether prepared by the Employer or a product of other employees, are and shall remain the exclusive property of the Employer. The above mentioned information will not be used or retained by the Employee except in the course of employment by the Employer. Upon termination of employment or at the request of the Employer at any time, all such items in the possession of the Employee shall be returned to the Employer.

**4. Confidentiality Obligations Continue After Employment Ends**. Employee understands and acknowledges that his or her obligations under this Agreement with regard to any particular Confidential Information shall commence immediately upon the Employee first having access to such Confidential Information, whether before or after he or she begins employment by the Employer, and shall continue during and after his or her employment by the Employer until such time as such Confidential Information has become public knowledge other than as a result of the Employee's breach of this Agreement or breach by those acting in concert with the Employee or on the Employee's behalf.

There is no question that the Agreement prohibits misappropriating the Company's property and Confidential Information as you have evidently done. Not only are your actions in direct contravention of the Agreement and your continuing obligations to the Company, but likely constitute violations of criminal law.

*BM*

Moreover, you further sought to injure the Company by contacting Company Employees Leonard Baldassare, Dylan Galm, and Joe Stevenson to induce them to end their employment relationships with the Company and become employees of Carver. This was a blatant attempt to disrupt the Company's business operations and to tortiously interfere with its relationships with its employees.  Such actions also violate your obligations as set forth below:

> **12. Non-Solicitation**. Employee agrees they will not directly or indirectly solicit, induce, or otherwise persuade employees to leave HMS to work for or with Employee or a third party.

The foregoing clearly prohibits you from soliciting employees to leave the Company to work for another employer, even after your separation with the Company.

You hereby are on notice that the Company will be taking all action necessary to protect its rights.  Nevertheless, we demand that you take the following actions:

1.  Immediately cease and desist from all activities in violation of the Agreement, including but not limited to disclosure of the Company's Confidential Information to Carver and contacting Company Employees to induce them to end their employment relationships with the Company and become employees of Carver;

2.  Account for every single Company document, file, message, record, or any other information and/or data you misappropriated and retained after the cessation of your employment with the Company on December 2, 2022 by creating a list of such items;

3.  **By Monday, January 23, 2023, no later than 3:00 p.m., provide to the undersigned the list of the items referenced above and confirm in a signed writing that you have accounted for all such items and returned all versions electronic of Company information and property to the undersigned.**

If you fail to comply with this demand, we will assume that you do not wish to resolve this matter, and we will respond accordingly by taking all steps necessary to protect the Company's legal rights under the Agreement and at law.  This may include the initiation of a lawsuit against you and/or your employer, for claims including, but not limited to, breach of contract and tortious interference with business relations, seeking all available remedies under the law or in equity, including monetary damages, injunctive relief, attorneys' fees and costs.

This letter is not a complete statement of the Company's rights in connection with this matter and nothing herein shall constitute or be deemed a waiver, estoppel, admission, or prejudice of any kind to our client's rights and defenses under the law or otherwise.  This reservation of rights includes, but is not limited to, any prior violation of the Agreement that the Company now, or later determines, has occurred.  All rights are reserved.

Lastly, given the strong likelihood of litigation as a result of your improper conduct, until a resolution is reached, you are hereby placed on notice to preserve all potential and actual

evidence related to the above-claims.  This includes electronic records of your activities, e-mail messages, text messages, files or information, in electronic, paper or any form of media, related to this dispute on any work or home computer.  If you choose to do otherwise, the Company will treat this matter with the utmost seriousness and will seek any and all available civil remedies and sanctions.

**PLEASE GOVERN YOURSELF ACCORDINGLY.**

Sincerely,
**AKERMAN LLP**

*/s/ Jeffrey Kimmel*

Jeffrey Kimmel

Encl.

Cc: Thomas Marron, Carver Companies

## Confidentiality Agreement

As a condition to Employee's employment/continued employment with Harley Marine Services, Inc., its subsidiaries and/or affiliates, collectively referred to as the "Employer" and to receive the compensation package, assignments, training, introductions, and access to Employer's proprietary business information, and for other valuable consideration, including continued employment, the adequacy of which is hereby acknowledged Employee agrees to the following:

**1. Trade Secrets and Confidential Information**.  Employee recognizes and agrees that he/she shall treat as confidential and proprietary all aspects of the Employer's business that is not generally known to the public including, but not limited to, customer identities and information, rates charged/billed, services performed, contract terms, the history of the relationship between the Employer and its customers, and the identity of customers' contracting agencies; pricing information; sales information; prospect lists; policy manuals; procedure manuals and techniques; business financial data and records; staffing, organizational structures and compensation/benefit programs, to include employment contracts; information programs and systems; information relating to any pending or potential future litigation, to include investigations by any federal or state agencies or other regulatory agencies; training techniques; and all other forms of technical and proprietary information which was developed by the Employer.  Employee also agrees never, directly or indirectly, to use, disseminate, disclose, or otherwise reveal any such information or material to any person, firm, corporation, association, or other entity doing, or planning to do, business in competition with the Employer for any reason or purpose whatsoever without the prior written consent of the Employer.

**2. Property of the Employer**.  Employee agrees that the originals and copies of all files, records, lists, specifications, documents, equipment and software, whether prepared by the Employer or a product of other employees, are and shall remain the exclusive property of the Employer.  The above mentioned information will not be used or retained by the Employee except in the course of employment by the Employer.  Upon termination of employment or at the request of the Employer at any time, all such items in the possession of the Employee shall be returned to the Employer.

**3. Use of Trade Secrets and Confidential Information While Employed**.
Employee understands that the Employer's proprietary and confidential information as described in Paragraphs 1 and 2, above, has considerable value to the Employer.  This information will be treated confidentially at all times and extreme care will be exercised in the custody, control and distribution of this material.  The loss of any of this information or unauthorized disclosure which may cause harm, directly or indirectly, to Employer's business and/or reputation is a violation of this policy which

*B M*

could subject Employee to dismissal or legal actions to recover monetary damages.

**4. Confidentiality Obligations Continue After Employment Ends**.  Employee understands and acknowledges that his or her obligations under this Agreement with regard to any particular Confidential Information shall commence immediately upon the Employee first having access to such Confidential Information, whether before or after he or she begins employment by the Employer, and shall continue during and after his or her employment by the Employer until such time as such Confidential Information has become public knowledge other than as a result of the Employee's breach of this Agreement or breach by those acting in concert with the Employee or on the Employee's behalf.

**5. Consent**.  Employee agrees that if any question arises during the course of his/her employment as to whether he/she has authority to release information to non-employees of the Employer, he/she will seek a clarification from his/her immediate supervisor before doing so.

**6. Severability**.  If any of the provisions of this Agreement are found by a court to be unreasonable, this Agreement may be reformed or modified by the court to make the restrictions reasonable under the circumstances.

**7. Remedies**.  In the event of a breach or imminent breach of any of the provisions of this Agreement, Employee agrees that the Employer shall be entitled to an injunction if warranted by law or equity, including a temporary restraining order and a preliminary injunction, restricting Employee from committing or continuing the breach/threatened breach.  In addition, Employer shall be entitled to any damages suffered by such breach.

**8. Attorneys' Fees**.  If a temporary, preliminary or permanent injunction is ordered by a court because Employee has violated the terms of this Agreement, or Employer is awarded damages for such breach, Employee agrees to reimburse Employer for all reasonable attorney fees and costs incurred in its effort to enforce this Agreement.  Conversely, if Employer does not prevail in a breach of contract action seeking enforcement of this Agreement, it agrees to reimburse Employee for his/her reasonable attorney fees and costs of defending those actions.

**9. Forbearance**.  The failure of either party to this Agreement to insist upon the performance of any of the terms and conditions of this Agreement, or the waiver of any breach of any of the terms and conditions of this Agreement, shall not be con-strued as thereafter waiving any such terms and conditions, but the same shall continue and remain in full force and effect as if no such forbearance or waiving had occurred.

**10. Savings Clause**.  The invalidity of any portion of this Agreement will not and shall not be deemed to affect the validity of any other provision.  In the event that any provision is held to be invalid, the parties agree that the remaining portions shall be

*BM*

deemed to be in full force and effect as if they had been executed by the parties subsequent to the expungement of the invalid provisions.

**11. Governing Law**.  This Agreement shall be governed by, construed and enforced in accordance with the laws of the state where I was physically employed by the Employer immediately after the signing of this Agreement.

**12. Non-Solicitation.** Employee agrees they will not directly or indirectly solicit, induce, or otherwise persuade employees to leave HMS to work for or with Employee or a third party.

☑ Signature
Brian Moore 2/6/2018 10:20 AM
(checking the checkbox above is equivalent to a handwritten signature)

Brian
Moore

Digitally signed by
Brian Moore
Date: 2023.01.23
09:14:46 -05'00'

*B M*