**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Harley Marine NY, INC.,<br><br>     Plaintiff,<br><br>v.<br><br>BRIAN MOORE,<br>CARVER MARINE STEEL WORKS,<br>LLC d/b/a CARVER COMPANIES,<br><br>     Defendants. | CIVIL ACTION<br>CASE NO.1:23-cv-00163-AMN-CFH |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR**
**A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

AKERMAN LLP
*Attorneys for Plaintiff*
1251 Avenue of the Americas, 37th
Floor
New York, New York 10020
Telephone: (212) 880-3800
Facsimile: (212) 905-6408

## TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES .............................................................................................. ii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 2

        A.     HMNY Logistics Corporation ......................................................................2

        B.     The Confidentiality Agreement ...................................................................2

        C.     B. Moore Suddenly Leaves HMNY...............................................................5

        D.     B. Moore's Recruitment and Solicitation of HMNY's employees...................6

        E.     B. Moore's Theft of HMNY's Confidential Information ................................8

        F.     HMNY Sends Cease-and-Desist Letters B. Moore and Carver......................10

ARGUMENT  THIS COURT SHOULD GRANT HMNY'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION............................................. 12

    I.    HMNY Is Likely To Succeed On the Merits Of Its Claims Stemming From B. Moore's Theft of HMNY's Confidential Information and Soliciting of HMNY's Employees ......................................................................................13

        A.     B. Moore's Breach of His Contractual Obligations .........................................14

        B.     B. Moore and Carver's Violations of Trade Secret Law..................................15

            i.     HMNY's Confidential Information are trade secrets......................... 15

            ii.     B. Moore and Carver misappropriated HMNY's trade secrets........... 17

        C.     B. Moore's Violations of the New Jersey Computer Offenses Act ................18

        D.     B. Moore's Tortious Interference with HMNY's Economic Relationships.....................................................................................................19

        E.     Carver's Tortious Interference with HMNY's Contract .................................20

        F.     B. Moore and Carver's Unfair Competition....................................................21

    II.    HMNY Will Suffer Irreparable Harm In The Absence Of An Injunction Restraining B. Moore From Continuing To Violate His Confidentiality Agreement.......................................................................................................22

    III.    The Balance Of Equities Weigh In Favor Of Granting HMNY's Motion For A Temporary Restraining Order and Preliminary Injunction...........................24

    IV.    Public Interest Favors A Temporary Restraining Order And Preliminary Injunction ....................................................................................................25

CONCLUSION..................................................................................................................... 25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aon Risk Serv. Northeast, Inc. v. Cusack*,
  958 N.Y.S.2d 114 (1st Dep't 2013)......................................................................13

*AUA Private Equity Partners, LLC v. Soto*,
  2018 WL 1684339 (S.D.N.Y. Apr. 5, 2018)...........................................................17

*Ayco Co., L.P. v. Frisch*,
  795 F.Supp.2d 193 (N.D.N.Y., 2011).........................................................13, 23, 24

*Beverly Hills Motoring, Inc. v. Morici*,
  2015 WL 248352 (D.N.J. Jan. 20, 2015).................................................................20

*Chubb Ina Holdings Inc. v. Chang*,
  2017 WL 499682 (D.N.J., 2017) ............................................................................17

*Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co.*,
  912 F. Supp. 747 (D.N.J. 1995) ..............................................................................21

*Corporate Synergies Group, LLC v. Andrews*,
  2019 WL 3780098 (D.N.J., 2019) ..........................................................................16

*Cortland Line Holdings LLC v. Lieverst*,
  2018 WL 8278554 (N.D.N.Y., 2018) ......................................................................25

*DiGiorgio Corp. v. Mendez & Co., Inc.*,
  230 F. Supp. 2d 552 (D.N.J. 2002) .........................................................................20

*Divorce Funding LLC v. Scrantom*,
  978 F. Supp. 2d 341 (S.D.N.Y. 2013).....................................................................18

*Euro Brokers Capital Markets, Inc. v. Flinn*,
  No. 93 Civ. 3785, 1993 WL 213026 (S.D.N.Y. June 16, 1993).......................23, 24

*FMC Crp. v. Taiwan Tainan Giant Industrial Co., Ltd.*,
  730 F.2d 61 (2d Cir.1984).......................................................................................23

*Free Country Ltd v Drennen*,
  235 F Supp 3d 559 (SDNY 2016) ...........................................................................12

*Graco, Inc. v. PMC Global, Inc.*,
  2009 WL 904010 (D.N.J.,2009) .............................................................................14

*Iacovacci v. Brevet Holdings*,
  LLC, 437 F. Supp. 3d 367 (S.D.N.Y. 2020) ...................................................................16

*International Business Machines Corporation v. De Freitas Lima*,
  2020 WL 5261336 (S.D.N.Y., 2020) .........................................................................12

*International Business Machines Corporation v. Mueller*,
  2017 WL 4326114 (S.D.N.Y., 2017) .........................................................................13

*Jackson Hewitt, Inc. v. Barnes*,
  2011 WL 181431 (D.N.J. Jan. 18, 2011) ...................................................................23

*Lumex, Inc. v. Highsmith*,
  919 F.Supp. 624 (E.D.N.Y.1996) ...............................................................................23

*Marina District Development Company LLC v. AC Ocean Walk LLC*,
  2021 WL 1526552 (D.N.J., 2021) .........................................................................20, 21

*Natsource LLC v. Paribello*,
  151 F.Supp.2d 465 (S.D.N.Y.,2001)...........................................................................24

*Onyx Renewable Partners L.P. v. Hilary Kao*,
  2023 WL 405019 (S.D.N.Y., 2023)............................................................................18

*P.C. of Yonkers, Inc. v. Celebrations! The Party And Seasonal Superstore, L.L.C.*,
  2007 WL 708978 (D.N.J.,2007) .................................................................................19

*Par Pharm., Inc. v. QuVa Pharma, Inc.*,
  764 F. App'x 273 (3d Cir. 2019) ..........................................................................15, 17

*Rest. Techs., Inc. v. Allora*,
  No. 06-cv-05202, 2008 WL 3843527 (D.N.J. Aug. 15, 2008) ...................................22

*Stryker Corp. v. Hagag*,
  *No.* CV2112499ESCLW, 2022 WL 3107163 (D.N.J. Aug. 3, 2022).......................25

*Syncsort Inc. v. Innovative Routines Int'l, Inc.*,
  04-3623, 2011 WL 3651331 (D.N.J. Aug. 18, 2011) ...............................................17

*Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc.*,
  No. 15-cv-211, 2016 WL 5338550 (S.D.N.Y. Sept. 23, 2016) ...............................17

*Tesla Wall Sys., LLC v. Related Companies, L.P.*,
  No. 17-CV-5966 (JSR), 2017 WL 6507110 (S.D.N.Y. Dec. 18, 2017) ...................16

*Trump's Castle Associates v. Tallone*,
  275 N.J. Super. 159 (App. Div. 1994) ........................................................................16

iii

*Wellness Pub. v. Barefoot*,
   CIV.A. 02-3773 (JAP), 2008 WL 108889 (D.N.J. Jan. 9, 2008)............................................22

*Wisdom Import Sales Co. v. Labatt Brewing Co.*,
   339 F.3d 101 (2d Cir.2003)................................................................................................23

**Statutes**

18 U.S.C. § 1836................................................................................................ *passim*

N.J.S.A. 56:15-3...........................................................12, 15, 17, 18 BA_Cite_024C37_000255

N.J.S.A. § 2A:38A .........................................................................................12. 18, 19

Plaintiff   Harley Marine NY, Inc. ("HMNY" or the "Company" or "Plaintiff") respectfully submits this Memorandum of Law in support of its Motion for a Temporary Restraining Order and Preliminary Injunction, restraining Defendant Brian Moore ("B. Moore") and Defendant Defendant Carver Marine Steel Works, LLC d/b/a Carver Companies ("Carver") (collectively "Defendants") as set forth in the accompanying Order to Show Cause and the Complaint.

## PRELIMINARY STATEMENT

This dispute arises from B. Moore's flagrant disregard of the confidentiality agreement he executed with HMNY at the commencement of his employment and his post-employment theft of HMNY documents and information. Specifically, this agreement contained confidentiality provisions protecting the valuable confidential information and trade secrets of HMNY as well as a non-solicitation of employees clause. The confidentiality agreement was crafted to protect the substantial investment of time and money HMNY made in establishing and growing its business. In violation of this agreement, weeks after his departure from HMNY, B. Moore surreptitiously accessed his former employer's information systems and stole confidential and proprietary electronic files for the apparent benefit of himself and his new employer, Carver. B. Moore stole these documents for the purpose of aiding a competitor that offers similar services in the maritime industry.

B. Moore also violated his confidentiality agreement by inducing three valuable employees Leonard Baldassare ("Mr. Baldassare"), Dylan Galm ("Mr. Galm") and Joe Stevenson ("Mr. Stevenson") of HMNY to leave HMNY to join him at Carver. Indeed, the non-solicitation provision of B. Moore's confidentiality agreement expressly prohibits him from directly or indirectly soliciting or inducing HMNY employees from leaving to join a third party such as Carver.

This duplicitous conduct warrants injunctive relief in this case. The irreparable harm that HMNY has suffered and will continue to suffer if the confidentiality agreement is not immediately enforced and the absence of any significant hardship to B. Moore or Carver if such injunctive relief were granted warrants immediate relief by this Court.

For these reasons and for those set forth more fully below, HMNY respectfully requests that this Court grant its motion for a temporary restraining order and preliminary injunction.

## STATEMENT OF FACTS

### A.    HMNY Logistics Corporation

HMNY is a premier marine transportation operator with one of the largest and most diverse fleets serving the East and Gulf Coasts of the United States. *See* Declaration of Matt Godden ("Godden Decl."), sworn to on February 6, 2023, at ¶ 5. which is submitted contemporaneously herewith. HMNY offers its customers various services, including: (i) bunkering; (ii) terminal transportation; (iii) ship assists and escort; (iv) rescue and general towing; and (v) freight barge transportation. *Id*. ¶ 6.

In 2018, B. Moore began his employment at HMNY as a Captain, out of Bayonne, New Jersey. *See* Declaration of Kelly Moore ("Moore Decl."), sworn to on February 7, 2023, at ¶ 5, 7. By February 2020, B. Moore was promoted to Director of U.S. East Coast Operations. *Id*. at ¶ 6.

### B.    The Confidentiality Agreement

In connection with his employment, B. Moore signed a confidentiality agreement (the "Confidentiality Agreement") dated February 6, 2018, Moore Decl., Ex. 1,[1] which contained, among other things, provisions detailing his obligations vis-à-vis HMNY's confidential

---

[1]    All exhibits are referred to herein as "Ex. __,"

2

information and an agreement to not directly or indirectly induce or encourage HMNY's employees to leave HMNY. *Id*.

Given the sensitive nature of the confidential business and industry information to which B. Moore was exposed, it was critical to HMNY that he agree to a confidentiality agreement to ensure that, if B. Moore ever left his employment, the information to which B. Moore had access would not be used by a competitor or be accessed by any other unauthorized party.

Section 1 and 2 of the Confidentiality Agreement states:

> **1. Trade Secrets and Confidential Information**. Employee recognizes and agrees that he/she shall treat as confidential and proprietary all aspects of the Employer's business that is not generally known to the public including, but not limited to, customer identities and information, rates charged/billed, services performed, contract terms, the history of the relationship between the Employer and its customers, and the identity of customers' contracting agencies; pricing information; sales information; prospect lists; policy manuals; procedure manuals and techniques; business financial data and records; staffing, organizational structures and compensation/benefit programs, to include employment contracts; information programs and systems; information relating to any pending or potential future litigation, to include investigations by any federal or state agencies or other regulatory agencies; training techniques; and all other forms of technical and proprietary information which was developed by the Employer. Employee also agrees never, directly or indirectly, to use, disseminate, disclose, or otherwise reveal any such information or material to any person, firm, corporation, association, or other entity doing, or planning to do, business in competition with the Employer for any reason or purpose whatsoever without the prior written consent of the Employer
>
> **2. Property of the Employer**. Employee agrees that the originals and copies of all files, records, lists, specifications, documents, equipment and software, whether prepared by the Employer or a product of other employees, are and shall remain the exclusive property of the Employer. The above mentioned information will not be used or retained by the Employee except in the course of employment by the Employer. Upon termination of employment or at the request of the Employer at any time, all such items in the possession of the Employee shall be returned to the Employer.

*Id* § 1, 2.

In executing the Confidentiality Agreement, B. Moore voluntarily agreed not to share, disclose, or otherwise use the Company's information unless it directly related to his employment with the Company.

Section 4 of the Confidentiality Agreement states:

> **4. Confidentiality Obligations Continue After Employment Ends**. Employee understands and acknowledges that his or her obligations under this Agreement with regard to any particular Confidential Information shall commence immediately upon the Employee first having access to such Confidential Information, whether before or after he or she begins employment by the Employer, and shall continue during and after his or her employment by the Employer until such time as such Confidential Information has become public knowledge other than as a result of the Employee's breach of this Agreement or breach by those acting in concert with the Employee or on the Employee's behalf.

*Id* § 4.

HMNY has a legitimate business interest holding Mr.. Moore to these restrictive covenants contained in the Confidentiality Agreement. These legitimate business interests include, but are not limited to, protecting confidential business information such as pricing information, sales information, prospect lists, policy manuals, procedure manuals and techniques, business financial data and records, and equipment lists. Critically, if this information is shared with an unauthorized party, HMNY would be at a severe competitive disadvantage.

The Confidentiality Agreement also contains a reasonable non-solicitation provision which prohibits B. Moore from poaching HMNY's employees to work for him or another employer.

Indeed, pursuant to Section 12, B. Moore agreed not to:

> **12. Non-Solicitation**. Employee agrees they will not directly or indirectly solicit, induce, or otherwise persuade employees to leave HMS to work for or with Employee or a third party.

*Id* § 12.

These provisions are reasonably necessary and reasonably tailored to protect HMNY's legitimate business interests, justifying these restrictions given that, *inter alia*, in his role as Director of U.S. East Coast Operations, B. Moore had knowledge of the terms of employment of his supervisees as well as significant influence over their employment decisions.

### C.    B. Moore Suddenly Leaves HMNY

On or about November 18, 2022 HMNY received unexpected news that B. Moore had resigned from his position. *See* Moore Decl., at ¶ 11. Prior to his resignation, B. Moore had never mentioned his plans to resign or even made any comments or references indicating that he was looking to leave the Company for another opportunity. *Id*. ¶ 12. In fact, HMNY had just increased his salary. *Id*.

After B. Moore submitted his resignation, B. Moore was guarded about his reasons for leaving the Company and about the identity of his new employer. *Id*. ¶ 13. Instead, B. Moore told HMNY that he was leaving to work for a "tugboat" business. *Id*. He did not share with HMNY what his new job title would be for this new employer. *Id*. ¶ 14.

Although B. Moore was scheduled to work for HMNY up until December 2, 2022, his last day of work at the Company was November 30, 2022. Moore Decl.,  ¶ 14. Through social media HMNY learned that B. Moore's next job was as a "General Manager" for Carver—another business that provides a variety of tugboat and transport services. *Id*. ¶ 14, 36.

On or about December 1, the Company mailed B. Moore a "termination package," in which he was reminded of his legal obligations arising from the Confidentiality Agreement that

he signed upon his hiring. Godden Decl., ¶ 9, Ex. 1. Specifically, this letter reminded B. Moore to "please understand the terms of the [Confidential] agreement still apply." *Id.*

### D.    B. Moore's Recruitment and Solicitation of HMNY's employees

Soon after his departure, HMNY discovered that B. Moore was actively recruiting certain key employees of HMNY. Moore Decl. ¶ 15. Specifically, HMNY learned that he recruited and solicited Joseph Stevenson ("Mr. Stevenson"), Leonard Baldassare ("Mr. Baldassare"), and Dylan Galm ("Mr. Galm") to leave the Company and work for B. Moore's new employer, Carver. *Id.*

Mr. Stevenson began working for HMNY the same year as B. Moore. *Id.* ¶ 16. He was initially hired to work as a Warehouse Operations Assistant and was later promoted to Deckhand. *Id.* During his employment, Mr. Stevenson worked closely with B. Moore. *Id.* Mr. Baldassare began working for HMNY in 2019 as an Assistant Port Captain. *Id.* ¶ 17.  He was eventually promoted to Senior Port Captain, and worked alongside B. Moore, who was also his direct supervisor. *Id.*  Mr. Galm has been with HMNY since January 2017—well before B. Moore began his employment with the Company. Initially, Mr. Galm was hired to work as a Barge Mate. *Id.* ¶ 18. Throughout his employment, Mr. Galm was given many opportunities to learn more about the business from an operational side. *Id.* Eventually, the experience he gained at HMNY led him to be promoted within the Company to the position of Marketing and Logistics Manager. *Id.* In that role, Mr. Galm had significant interfacing with HMNY's customers. *Id.*

On December 14, 2022, Mr. Stevenson resigned from his position as Deck Hand. *Id.* ¶ 19 On or around that same day, Mr. Stevenson mentioned that B. Moore "had asked him to come work for him at Carver," and that he did not want to pass up the opportunity. *Id.* It was deeply disturbing that B. Moore would so blatantly solicit Mr. Stevenson to work for another maritime

business given that recruiting and retaining experienced mariners is a significant challenge in the industry. *Id*. On January 16, 2023, Mr. Galm told HMNY that he had received another job offer that he felt he needed to pursue for his family. Godden Decl., ¶ 13. Galm also assured the Company that he was not seeking this opportunity, but that the opportunity came to him. *Id*. Galm told the Company, "I have to be honest with you, I am leaving to go work with Brian [Moore] at Carver." *Id*. Galm also stated that "Brian was [his] Captain," referring to the close relationship he had with B. Moore. *Id*. The day after Mr. Galm resigned, on January 17, 2023, Mr. Baldassare, also resigned from his position. Moore Decl., ¶ 21. Mr. Baldassare also mentioned that B. Moore had spoken to him and convinced him to join B. Moore to work for Carver. *Id*. ¶ 22-23.

The departure of Mr. Stevenson, Mr. Galm, Mr. Baldassare, especially in a tight labor market, are devastating to HMNY.

For the past four years, Mr. Galm was considered to be HMNY's point person for all contract negotiations and potential customer opportunities. *Id*. ¶ 28  Indeed, each month, Mr. Galm was responsible for handling several million dollars' worth of HMNY's business revenues. *Id*. In addition to having important financial functions for HMNY, a major aspect of Mr. Galm's role was also to check on competitive activity and to develop new methods for capturing market shares from competitors and to develop new methods to obtain new contracts or accounts. *Id*. Additionally, Mr. Baldassare had significant influence in the development of HMNY's company operations and procedures. *Id*. ¶ 27. In fact, B. Moore and Mr. Baldassare were the decisionmakers on the day-to-day operational issues for HMNY's East Coast operations. *Id*.

On or around January 31, 2023 and February 1, 2023, HMNY learned that Carver, without any prompting by HMNY, had apparently suspended and/or rescinded Mr. Baldassare and Mr. Galm's job offers. Godden Decl., ¶ 33-34.  After their job offers at Carver were

rescinded, HMNY offered Mr. Galm and Mr. Baldassare the opportunity to remain employed with the Company, however, both of them refused this offer. *Id.* ¶ 35.

### E.    **B. Moore's Theft of HMNY's Confidential Information**

Given B. Moore's blatant and intentional violations of the non-solicitation clause, HMNY decided to further investigate B. Moore's last activities before leaving the Company. Godden Decl. ¶ 18. On or about January 19, 2023, HMNY checked the activity log of HMNY's Dropbox account which provides the following data: (i) the employee's username; (ii) the type of activity performed while logged in (e.g. downloads, transfer of file); (iii) the device used to log-in to the account (desktop v. mobile); (iv) the location where the employee member logged in to the account; and (v) the filename extension which indicates the nature of the document viewed or downloaded. *Id.*

The Dropbox Activity Log revealed that B. Moore, using his HMNY log-in information, had logged in HMNY's Dropbox account well after he left the Company. *Id.* ¶ 19, 28, Ex. 3. Specifically, B. Moore logged in to HMNY's Dropbox on the following dates: (i) December 18, 2022 in Kingston, New York ; (ii) December 30, 2022 in Kingston, New York; and (iii) January 5, 2023 in Buffalo, New York. *Id.* ¶ 19, 28, Ex. 3.  On those dates, B. Moore had already begun working for Carver. Moore Decl. ¶ 32. HMNY found that B. Moore had had accessed and downloaded various files regarding the Company's tugboats, including (i) Stability Letters regarding each tugboat's seaworthiness; (ii) "Blue Cards" from the Company's insurance carrier in London, U.K.; (iii) Bridge Letters showing the various corporate entities who own each vessel;  (iv) equipment list for each vessel; and (v) "spec sheets" showing operating and mechanical data for each tug boat such as: fuel capacity, fluid density, flow rate, and operating pressure and temperature. *Id.*  ¶ 34. This information is confidential information not accessible in the public realm.  *Id.*  ¶ 35.

The documents that B. Moore downloaded include a file called "Master Voyage Economics2.Numbers" ("Master Voyage"). Godden Decl., ¶ 26. This document contains particularly sensitive, highly confidential and proprietary information. Specifically, it is a pricing and bidding sheet with information based on internal knowledge that HMNY has accumulated over the last two decades, including but not limited to: (i) specific and actual performance of each HMNY vessel (i.e. how much fuel was burned, speed, distance); (ii) voyage runs and distances traveled; (iii) specific routes that can be operated safely; and (iv) expenses for consumables. *Id.* This type of information is plugged into an Excel spreadsheet, which then calculates and converts this information into a "day rate," for each vessel. *Id.* The day rate is a metric that HMNY uses to determine its price rates for existing and new customers and profitability or financial viability of those rates. *Id.*

The data and information contained in the "Master Voyage" spreadsheet is not publicly available and is considered highly confidential. *Id.*  ¶ 21. In fact, only few employees working for HMNY have access to this information—(i) the Sales and Charter Team, which includes Dylan Galm; (ii) the Executive Team; and (iii) Directors of Operations, which included B. Moore. *Id.*

The Dropbox Activity Log shows that B. Moore accessed HMNY's information using a mobile device from two locations—Kingston and Buffalo, New York. *Id.* ¶ 28. Based on HMNY's employment records, B. Moore resides in Kingston, New York, and based on an online search, Carver maintains an office in Buffalo, New York. *Id.* Given that HMNY does not have any presence in either Kingston and Buffalo, there is no doubt that B. Moore was wrongfully accessing and downloading HMNY's information from his home *and* while working from his new employer's offices. *Id.*. After learning that of B. Moore's unauthorized access and theft of

documents, HMNY quickly terminated B. Moore's access and deactivated his username. *See* Declaration of Steve Miller ("Miller Decl."), sworn to on February 7, 2023, at ¶ 13.

### F.    HMNY Sends Cease-and-Desist Letters B. Moore and Carver

In an attempt to avoid the necessity of court proceedings, on January 20, 2023, legal counsel for HMNY sent cease-and-desist letters to both B. Moore and Carver. *Id*. ¶ 29. In the letters, HMNY disclosed its discovery of B. Moore's wrongful solicitation of HMNY employees as well as his theft of Company information. *Id*. On January 23, 2023, HMNY's legal counsel received a response from B. Moore where he disingenuously denied taking any information belonging to HMNY other than one document titled "HMS Liberty," which he claims he inadvertently took with him. *Id*. ¶ 30. He denied accessing HMNY's Dropbox account and stated that he had returned HMNY's laptop and his work phone on the last day of employment, so he "cannot account for the log-in after [his] departure." *Id*. However, the fact that B. Moore had turned over his HMNY's work equipment is irrelevant because it would not stop his ability to access the Company's Dropbox account. *Id*. According to the Dropbox Activity Log, B. Moore very likely used his personal mobile device to access the Dropbox website and using his former HMNY username and password credentials. *Id*.

Notably, in his response letter, B. Moore did not deny talking to or recruiting HMNY employees. *Id*. ¶ 31. Instead, he simply claimed that the departure of Mr. Galm, Mr. Stevenson, and Mr. Baldassare were not "initiated" by him. *Id*. Essentially, he admits that he played a role in soliciting and encouraging the departure of these employees. *Id*.

Additionally, counsel for Carver, Anthony V. Cardona ("Attorney Cardona") contacted counsel for HMNY to discuss the cease-and-desist letter on January 26, 2023. *See* Declaration of Urgency by Jeffrey A. Kimmel ("Kimmel Decl."), sworn to on February 14, 2023, at ¶ 6. During this conversation, counsel for HMNY advised that the Company would not file a motion for a

temporary restraining order if Carver agreed to not use the confidential information illegally obtained by B. Moore to compete with HMNY, to attest that all electronic and hard copies had been destroyed, and not solicit any other HMNY employees to work with B. Moore. *Id.*

Counsel for HMNY received a letter, dated January 30, 2023, from attorney Glen P. Doherty ("Attorney Doherty") who now represents Carver in this matter. *Id.* ¶ 7. In the letter, Attorney Doherty claimed that his client had no knowledge of B. Moore's illegal activities, despite the fact that B. Moore was employed by Carver when he downloaded HMNY's confidential information and apparently downloaded at least some these documents at work. *Id.* Counsel for HMNY called Attorney Doherty on January 31, 2023 to reiterate HMNY's position and the fact that unless Carver take immediate action to remedy the situation, HMNY would be filing the instant motion. *Id.*

During a later discussion, Attorney Doherty claimed that Carver would interview B. Moore about HMNY's allegations and would complete a search of its computer files to determine if B. Moore had uploaded any of HMNY's confidential information onto Carver's computer systems. *Id.* ¶ 8. To aid in Carver's search for HMNY's documents, counsel for HMNY provided Attorney Doherty with the titles of the various documents downloaded by B. Moore and specific search terms Carver could use to search for the documents. *Id.* ¶ 10. While Attorney Doherty claimed that Carver searched B. Moore work computer and Carver's servers using HMNY's suggested search terms and found no hits, Carver has yet to present any evidence that they performed this search that the documents do not otherwise reside on Carver's computers or servers. *Id.* ¶ 11.

**ARGUMENT**

**THIS COURT SHOULD GRANT HMNY'S
MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION**

A party seeking a temporary restraining order or preliminary injunction must typically show four elements: (1) a likelihood of success on the ultimate merits of the lawsuit; (2) a likelihood that the moving party will suffer irreparable harm if the injunction is not granted; (3) that the balance of hardships tips in the moving party's favor; and (4) that the public interest is not disserved by the relief granted. *Free Country Ltd v Drennen*, 235 F Supp 3d 559, 556 (SDNY 2016) (quoting *JBR, Inc. v. Keurig Green Mountain, Inc*., 618 Fed.Appx. 31, 33 (2d Cir. 2015)). Whether a movant has satisfied these elements in any given case is a determination committed to the sound discretion of the trial court. *Id*.

A court may grant injunctive relief even where an applicant cannot establish a likelihood of success on the merits, if it determines that the applicant "has raised questions going to the merits so serious, substantial, difficult, and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *International Business Machines Corporation v. De Freitas Lima*, 2020 WL 5261336, at *5 (S.D.N.Y., 2020) (quoting *Hamilton Watch Co. v. Benrus Watch Co*., 206 F.2d 738, 740 (2d Cir. 1953)). Under this standard the movant must establish that the harm which it would suffer is "'decidedly' greater" than the harm his opponent would suffer. *Id*.

HMNY brings suit for (1) breach of the Confidentiality Agreement against B. Moore; (2) violations of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 and New Jersey Trade Secrets Act, ("NJTSA") against B. Moore and Carver; (3) violations of the New Jersey Computer Record Offenses Act against B. Moore; (4) tortious interference with economic relations under New Jersey law against B. Moore; (5) tortious interference with contractual

relations under New Jersey law against Carver; (6) unfair competition under New Jersey law against B. Moore and Carver.

Even without the benefit of discovery, there is already sufficient evidence to conclude that HMNY will likely prevail on each of these claims and HMNY therefore respectfully requests that the Court grant its requested injunction.

## I. HMNY Is Likely To Succeed On the Merits Of Its Claims Stemming From B. Moore's Theft of HMNY's Confidential Information and Soliciting of HMNY's Employees

The Confidentiality Agreement contains a choice of law provision which states that the Agreement will be governed by, construed, and enforced in accordance with the laws of the state B. Moore was physically employed. Moore Decl., Ex. 1 § 11. Since B. Moore was employed by HMNY in the state of New Jersey, New Jersey law applies.

New York courts "apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." *International Business Machines Corporation v. Mueller*, 2017 WL 4326114, a *4 (S.D.N.Y., 2017); *see also Aon Risk Serv. Northeast, Inc. v. Cusack*, 958 N.Y.S.2d 114 (1st Dep't 2013) (upholding preliminary injunction against former employee) ("New York courts are willing to enforce parties' choice of law provisions."). B. Moore's contacts with New Jersey, through his former employment with HMNY, are more than sufficient to warrant enforcement of the New Jersey choice of law provision. Moreover, New Jersey law governs HMNY's non-contractual claims as well because the "conduct that gave rise to Plaintiff's tort law claims is the same as that which gave rise to its breach of contract claims." *Ayco Co., L.P. v. Frisch*, 795 F.Supp.2d 193, 204 (N.D.N.Y., 2011) (applying New York law to tort claims where the tort claims arose from breach of contract which had a New York choice of law provision).

**A.    B. Moore's Breach of His Contractual Obligations**

To state a claim of breach of contract under New Jersey law a party must allege "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." *Graco, Inc. v. PMC Global, Inc*., 2009 WL 904010, at *17 (D.N.J.,2009).

B. Moore has an undisputed obligation not to use or disclose HMNY's confidential and proprietary information without authorization. He likewise had and continues to have an undisputed obligation return and not take HMNY's valuable information after he decided to leave HMNY. Moore Decl., Ex. 1 § 1, 2.

B. Moore undoubtedly violated these provisions of the Confidentiality Agreement by accessing and downloading various confidential files regarding the Company's tugboats weeks after the end of his employment with HMNY. As a result of this egregious breach, HMNY has, at the very least, not received the benefit of the bargain associated with the Confidentiality Agreement with B. Moore, and will suffer an even greater harm if B. Moore is not enjoined from sharing HMNY's confidential information with Carver thereby further breaching the agreement.

B. Moore also had an undisputed obligation to not solicit HMNY's employees to work for another employer:

> **12. Non-Solicitation**. Employee agrees they will not directly or indirectly solicit, induce, or otherwise persuade employees to leave HMS to work for or with Employee or a third party.

Moore Decl., Ex. 1 § 12.

B. Moore breached this contractual obligation by inducing three HMNY employees to leave HMNY to work for Carver mere weeks after he himself left HMNY. The departure of these employee in a tight labor market after investing substantial resources in their training and development has greatly harmed HMNY. In particular, the departure of Mr. Galm has left

HMNY without the services of employees point person for all contract negotiations and potential customer opportunities and the departure of Mr. Baldassare has left HMNY without the services of an important decisionmaker on the day-to-day operational issues for HMNY's East Coast operations. Moore Decl., ¶ 27-28. If B. Moore is not enjoined from further soliciting HMNY's employees, he could further harm HMNY's business by inducing additional employees to work for Carver.

For the reasons set forth herein, including, but not limited to, the downloading of the multitude of confidential and/or proprietary documents and inducing HMNY's employees to work for Carver, B. Moore has unquestionably breached his contractual obligations.

**B.      B. Moore and Carver's Violations of Trade Secret Law**

B. Moore's theft of HMNY's confidential and proprietary documents and Carver's continued employment of B. Moore despite knowledge of B. Moore's theft constitute misappropriation of HMNY's trade secrets under the DTSA and NJTSA.

Both the DTSA and the NJTSA require plaintiffs to demonstrate "(1) the existence of a trade secret, defined broadly as information with independent economic value that the owner has taken reasonable measures to keep secret, and (2) misappropriation of that secret, defined as the knowing improper acquisition and use or disclosure of the secret." *Par Pharm., Inc. v. QuVa Pharma, Inc*., 764 F. App'x 273, 278 (3d Cir. 2019). Both the NJTSA (N.J.S.A. 56:15-3) and DTSA (18 U.S.C. § 1836(b)(3)(A)) also provide for prospective injunctive relief for actual or threatened misappropriation of trade secrets.

**i.      HMNY's Confidential Information are trade secrets**

Among the multitude of documents B. Moore illicitly downloaded after the end of his employment include pricing and bidding sheets with information that HMNY has accumulated over the last two decades, specifically: (i) specific and actual performance of each HMNY vessel

(i.e. how much fuel was burned, speed, distance); (ii) voyage runs and distances traveled; (iii) specific routes that can be operated safely; and (iv) expenses for consumables. Godden Decl., ¶ 25. B. Moore also stole various files that include the technical data regarding the Company's tugboats, including equipment list for each vessel and "spec sheets" showing operating and mechanical data for each tug boat such as: fuel capacity, fluid density, flow rate, and operating pressure and temperature. Moore Decl., ¶ 34. This information is not publicly available and HMNY took assiduous efforts to protect this information including by having employees who were exposed to this information, such as B. Moore, sign Confidentiality Agreements and by hiding this information behind a password protected website.

These documents and information are undoubtedly considered trade secrets. *See Corporate Synergies Group, LLC v. Andrews*, 2019 WL 3780098, at *4 (D.N.J., 2019) ("Customer lists, pricing information, and marketing techniques constitute trade secrets under New Jersey law and the DTSA."); *see also Tesla Wall Sys., LLC v. Related Companies, L.P.,* No. 17-CV-5966 (JSR), 2017 WL 6507110, at *10 (S.D.N.Y. Dec. 18, 2017) ("Tesla's complaint ... pleads numerous specific categories of [trade secret] information, such as 'technical data, internal pricing information, work product, research, engineering designs,' etc."); *Trump's Castle Associates v. Tallone*, 275 N.J. Super. 159, 162 (App. Div. 1994) ("[a] trade secret can also relate to other aspects of business operations such as pricing and marketing techniques or the identity and requirements of customers."). This is especially true given that HMNY invested years of work into developing this valuable information. *See Iacovacci v. Brevet Holdings*, LLC, 437 F. Supp. 3d 367, 381 (S.D.N.Y. 2020) (finding information constituted trade secrets where the plaintiff alleged the time invested in developing the putative trade secrets and that they were a valuable asset of the company).

Moreover, HMNY's assiduous efforts to protect these documents through use of confidentiality agreements and a password website further support the fact that these documents are trade secrets. *See, e.g., Par Pharm. Inc.,* 764 F. App'x at 278 (concluding that use of non-disclosure agreements and "appropriate facility security measures" were reasonable steps to protect manufacturing procedures under the DTSA and the NJTSA); *Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc*., No. 15-cv-211, 2016 WL 5338550, at *6 (S.D.N.Y. Sept. 23, 2016) ("Defendants have alleged that they have taken reasonable measures to keep the information secret by making those who use it subject to confidentiality provisions and limitations, and only making it accessible through strictly controlled servers such as the Customer Exchange."); *Syncsort Inc. v. Innovative Routines Int'l, Inc*., 04-3623, 2011 WL 3651331, at *3, *16 (D.N.J. Aug. 18, 2011) (use of license agreements, non-disclosures, and confidentiality agreements for end-users; a firewall; and confidentiality legends on printed materials were reasonable measures to protect proprietary software under New Jersey law).

### ii.      B. Moore and Carver misappropriated HMNY's trade secrets

By downloading HMNY's proprietary and confidential information after the end of his employment with HMNY for the apparent benefit of his new employer Carver, B. Moore misappropriated HMNY's trade secrets. *AUA Private Equity Partners, LLC v. Soto*, 2018 WL 1684339, at *7 (S.D.N.Y. Apr. 5, 2018) (concluding that complaint plausibly alleged misappropriation under DTSA where defendant was "alleged to have uploaded AUA trade secrets from her work laptop to her personal cloud-based storage without AUA's permission and in direct violation of the confidentiality agreements that she signed"); *Chubb Ina Holdings Inc. v. Chang*, 2017 WL 499682, at *10 (D.N.J., 2017) (concluding that allegations that former employees of Plaintiff intentionally misappropriated and disclosed trade secrets and/or confidential information of Plaintiff and upon information or belief "inevitably will use or

disclose" the confidential information to their new employer were sufficient to state a claim under the DTSA).

Even if B. Moore has not yet used any of the documents he downloaded for competitive benefit, his theft of these documents in violation of his Confidentiality Agreement in itself constitutes misappropriation. *See Onyx Renewable Partners L.P. v. Hilary Kao*, 2023 WL 405019, at *5 (S.D.N.Y., 2023) ("[e]mployees who abscond with their employers' trade secrets, even in the absence of any subsequent use or disclosure have been held to have improperly acquired such information") (internal quotations omitted) .

Moreover, HMNY has also sufficiently alleged that Carver will inevitably use or disclose HMNY's trade secrets given that they are or should be undoubtedly aware that B. Moore stole HMNY's Confidential Information and can use their unfettered access to that information to unfairly compete with HMNY. *Id.* at *5 (finding that plaintiff stated a claim for misappropriation after alleging "[u]pon information and belief…Defendant's wife was able to announce the formation of her own solar energy company with unfettered access to Onyx's trade secrets which form the building blocks of a solar energy business.") (internal quotations omitted); *Divorce Funding LLC v. Scrantom*, 978 F. Supp. 2d 341, 353 (S.D.N.Y. 2013) (finding a plausible inference of use of trade secret was raised where "knowledge of [the trade secret] would enable [the defendant] inevitably to better compete with [the plaintiff]").

Accordingly, HMNY has established a likelihood of success on the merits relative to its misappropriation claims under the NJTSA and DTSA.

### C.    B. Moore's Violations of the New Jersey Computer Offenses Act

The New Jersey Computer Related Offenses Act, N.J.S.A. § 2A:38A-3, provides for a cause of action where an enterprise is damaged in "business or property" as a result, among other things, of another's "purposeful or knowing, and unauthorized altering ... [or] taking ... of any

data, data base, computer program, computer software or computer equipment existing internally or externally to a computer, computer system or computer network," or "purposeful or knowing, and unauthorized accessing or attempt to access any computer, computer system or computer network." N.J.S.A. § 2A:38A-3(a), (c). "Property" is defined as including, but is not limited to, "financial instruments, information, data, and computer software, in either human readable or computer readable form, copies or originals, and any other tangible or intangible item of value." N.J.S.A. § 2A:38A-1(k). The New Jersey Computer Related Offenses Act specifically provides for the use of injunction proceedings to protect a damaged enterprise. N.J.S.A. § 2A:38A-5.

Here, B. Moore knowingly took, without authorization, HMNY's proprietary and confidential documents by downloading these documents via Dropbox in violation of the Confidentiality Agreement which expressly prohibited his unauthorized taking. HMNY will be damaged by B. Moore's unauthorized access of its Confidential Information because B. Moore will be able to use the information to help Carver compete unfairly with HMNY. *See P.C. of Yonkers, Inc. v. Celebrations! The Party And Seasonal Superstore, L.L.C.*, 2007 WL 708978, at *8 (D.N.J.,2007) (finding that plaintiffs stated a cause of action under the New Jersey Computer Related Offenses Act where they alleged that defendants used improperly accessed data to compete unfairly with plaintiffs) .

Therefore, HMNY is likely to prove that B. Moore violated the New Jersey Computer Related Offenses Act.

### D.    B. Moore's Tortious Interference with HMNY's Economic Relationships

"Under New Jersey law, a claim for tortious interference with prospective economic relations requires that the plaintiff establish: (1) a reasonable expectation of economic advantage; (2) that economic advantage was lost as a direct result of defendant's malicious interference; and

(3) plaintiff suffered damages." *Beverly Hills Motoring, Inc. v. Morici*, 2015 WL 248352, at *4 (D.N.J. Jan. 20, 2015).

Here, HMNY has a claim against B. Moore for tortious interference with a prospective economic relationship because (1) HMNY had a reasonable expectation that B. Moore would not solicit its employees to work for another employer in violation of the Confidentiality Agreement that he undoubtedly signed prior to his employment with HMNY, (2) HMNY was deprived of its employment relationships with three valuable employees as a direct result of B. Moore's malicious and violative conduct, and (3) is suffering the damages stemming from the loss of employment relationships with these employees.

Accordingly, B. Moore's improper inducement of HMNY's employees in violation of the non-solicitation provision of his Confidentiality Agreement constitutes tortious interference with HMNY's economic relationships. *See Marina District Development Company LLC v. AC Ocean Walk LLC*, 2021 WL 1526552, at *8 (D.N.J., 2021) (finding that a tortious interference claim sufficiently alleged where defendant used wrongful means to induce plaintiff's employees to work for defendant)

### E.    Carver's Tortious Interference with HMNY's Contract

To establish tortious interference with a contract under New Jersey Law a plaintiff must establish: "(1) an existing contractual relationship; (2) intentional and malicious interference with that relationship; (3) loss or breach of a contract as a result of the interference; and (4) damages resulting from that interference." *DiGiorgio Corp. v. Mendez & Co., Inc.*, 230 F. Supp. 2d 552, 558 (D.N.J. 2002).

HMNY can establish a claim against Carver for tortious interference with a contract because (1) the Confidentiality Agreement between HMNY and B. Moore prohibits him from disclosing the company's proprietary and confidential information, (2) Carver hired and

continues to employ B. Moore for the apparent purpose of accessing the company's Confidential Information, which has, and continues to cause (3) B. Moore to breach his Confidentiality Agreement with HMNY, (4) resulting in HMNY being at a competitive disadvantage. Indeed, the information B. Moore illegally downloaded, provides Carver with a blueprint on how to build a fleet that would compete with HMNY's. *See* Moore Decl., ¶ 36.

Therefore, HMNY, at this stage, has made a sufficient showing of a likelihood of success against Carver for tortious interference with HMNY's contract B. Moore. *See Marina District Development Company LLC*, 2021 WL 1526552, at *8 (finding that plaintiff sufficiently alleged a claim for tortious interference where "Defendant has straightforwardly alleged [] that, as part of Ocean's process of hiring away Borgata employees, Ocean violated multiple trade secrets laws and induced Borgata employees to violate noncompete clauses and restrictive covenants that extended and applied beyond the conclusion of any at-will employment").

### F.    B. Moore and Carver's Unfair Competition

The tort of unfair competition under New Jersey law "seeks to espouse some baseline level of business fairness" and "[b]y incorporating other causes of action, including tortious interference, breaches of duties of good faith and fair dealing, misappropriation and defamation, it applies a flexible and elastic standard of conduct in the commercial context." *Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co*., 912 F. Supp. 747, 786 (D.N.J. 1995) (citing *Columbia Broadcasting System, Inc. v. Melody Recordings, Inc*., 134 N.J. Super. 368, 375, 341 A.2d 348 (App. Div. 1975)). The conduct at issue must be "measured against the objective of unfair competition, which is to reinforce fair dealing and scrupulous conduct on the commercial level." *Id*. (citing *C.R. Bard, Inc. v. Wordtronics Corp*., 235 N.J. Super. 168, 172, 561 A.2d 694 (N.J. Super. Ct. Law Div. 1989)).

A prerequisite to an act of unfair competition is that one party misappropriates another's property:

> Although it is impossible to categorize all acts which constitute unfair competition, there are a few fundamental elements that are definite. In essence, unfair competition is a business tort. Generally it consists of the misappropriation of one's property by another— property which has some sort of commercial or pecuniary value.

*Wellness Pub. v. Barefoot*, CIV.A. 02-3773 (JAP), 2008 WL 108889, at *20 (D.N.J. Jan. 9, 2008) (quoting *N.J. Optometric Ass'n v. Hillman–Kohan Eyeglasses, Inc.*, 144 N.J.Super. 411, 427-28 (Ch.Div.1976). Furthermore, "[a] prima facie case of unfair competition, like tortious interference and employee piracy, requires evidence of bad faith or malicious conduct." *Wellness Pub. v Barefoot*, CIV.A. 02-3773 (JAP), 2008 WL 108889, at *20 (DNJ Jan. 9, 2008).

Here, there is no doubt that B. Moore fell well short of his duty of fair dealing by unscrupulously misappropriating HMNY's confidential and valuable property in express violation of his Confidentiality Agreement. *See Rest. Techs., Inc. v. Allora*, No. 06-cv-05202, 2008 WL 3843527, at *7 (D.N.J. Aug. 15, 2008) ("Misappropriation of confidential information may constitute unfair competition under New Jersey law."). Carver also engaged in unfair competition by hiring and continue to employ B. Moore for the apparent purpose of accessing HMNY's confidential information for competitive benefit.

Accordingly, HMNY has established a reasonable likelihood of success on the merits as to its unfair competition claims.

## II. HMNY Will Suffer Irreparable Harm In The Absence Of An Injunction Restraining B. Moore From Continuing To Violate His Confidentiality Agreement

HMNY will suffer irreparable harm, absent a temporary restraining order, in the form of: (1) further divulgement of its proprietary and confidential information; (2) further loss of its valuable employees; (3) harm to its market standing and client relationships in an aggressively

competitive environment; and (4) a signal to other HMNY employees that similar conduct will not be restrained.

Irreparable harm is characterized "as certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Import Sales Co. v. Labatt Brewing Co*., 339 F.3d 101, 113–14 (2d Cir.2003).

It is well-established that the injury caused by loss of confidential business information is ordinarily not measurable in terms of money damages and, therefore, such loss constitutes irreparable injury. *See*, *e.g*., *Ayco Co., L.P,* 795 F.Supp.2d at 205; *Euro Brokers Capital Markets, Inc. v. Flinn*, No. 93 Civ. 3785, 1993 WL 213026, at *1 (S.D.N.Y. June 16, 1993). Similarly, the threatened use or disclosure of trade secrets is inherently irreparable and irreparable injury is presumed in such circumstances. *See, e.g., Lumex, Inc. v. Highsmith*, 919 F.Supp. 624, 628 (E.D.N.Y.1996) ("[i]t is clear that irreparable harm is presumed where a trade secret has been misappropriated."); *Lumex, Inc. v. Highsmith*, 919 F.Supp. 624, 628 (E.D.N.Y.1996) *FMC Crp. v. Taiwan Tainan Giant Industrial Co., Ltd*., 730 F.2d 61, 63 (2d Cir.1984) ("[I]t is clear that the loss of trade secrets cannot be measured in money damages.... A trade secret once lost is, of course, lost forever.") (citations omitted).

The control over HMNY's proprietary business information by B. Moore when he was not supposed to have it and the fact that he misleadingly denied that he has such information poses a legitimate risk to HMNY's business interests because disclosure by B. Moore could not be remedied after any trial. *See Jackson Hewitt, Inc. v. Barnes*, 2011 WL 181431, at *4 (D.N.J. Jan. 18, 2011) ("Where a party is in possession of another party's confidential information and is poised to use or disclose such information, either personally or through an agent such as a parent or close associate, there is a likelihood of irreparable harm.").

The threat of immediate competition by a former employee with unique relationships with a former employer's clients also constitutes irreparable harm. *See e.g.*, *Natsource LLC v. Paribello*, 151 F.Supp.2d 465, 469 (S.D.N.Y.,2001); *Euro Brokers Capital Mkts. v. Flinn*, No. 93 Civ. 3785, 1993 WL 213026, at *1 (S.D.N.Y. June 16, 1993).

HMNY has established irreparable harm since it will be difficult, if not impossible, to predict the exact amount of damages which will result from the loss of HMNY's confidential and trade secret information, valuable employees, and standing in a competitive industry. HMNY is therefore entitled to a temporary restraining order and injunctive relief.

## III. The Balance Of Equities Weigh In Favor Of Granting HMNY's Motion For A Temporary Restraining Order and Preliminary Injunction

The balance of hardships tips heavily in favor of HMNY. HMNY seeks to hold B. Moore to nothing more than what he already expressly agreed to in his Confidentiality Agreement and to a widely accepted standard of fair dealing and competition. Indeed, B. Moore acknowledged that, in the event of a breach of the restrictive covenants, an injunction would be an appropriate remedy:

> **7. Remedies**. In the event of a breach or imminent breach of any of the provisions of this Agreement, Employee agrees that the Employer shall be entitled to an injunction if warranted by law or equity, including a temporary restraining order and a preliminary injunction, restricting Employee from committing or continuing the breach/threatened breach. In addition, Employer shall be entitled to any damages suffered by such breach.

Moore Decl., Ex. 1 § 7. HMNY relied upon B. Moore's contractual promises in employing him, sharing confidential information with him, and introducing him to HMNY's maritime business. In this regard, B. Moore should not be allowed to ignore these promises to suit his own personal and business interests nor should Carver be allowed to benefit from B. Moore's duplicitous conduct. *Ayco Co., L.P*, 795 F.Supp.2d at 210 (granting a preliminary injunction where "Plaintiff

24

[was] threatened with the imminent, irretrievable disclosure to competitors of confidential information, developed over years through significant effort and expense, and with the loss of the goodwill and trust of its client base.").

On the other hand, the requested injunctive relief, will not prohibit B. Moore from working for Carver nor would Carver be prevented from continuing to employ B. Moore. B. Moore would simply be enjoined from further breaching his contract and harming HMNY through unfair competition and Carver would simply be prevented from using HMNY's trade secrets to compete unfairly.

## IV.    Public Interest Favors A Temporary Restraining Order And Preliminary Injunction

The public interest is served by granting the requested injunction. While this matter involves a private dispute, the public nevertheless has an interest in insuring that contracts are enforced and that parties to contracts abide by their terms. *Cortland Line Holdings LLC v. Lieverst*, 2018 WL 8278554 (N.D.N.Y., 2018). Moreover, the public has an interest to ensure that confidential business information remains protected because its use for unfair competition is detrimental. *Stryker Corp. v. Hagag, No.* CV2112499ESCLW, 2022 WL 3107163, at *21 (D.N.J. Aug. 3, 2022).

## <u>CONCLUSION</u>

For the foregoing reasons, HMNY respectfully requests that this Court grant its motion for a preliminary injunction and temporary restraining order enjoining B. Moore and Carver as set forth in the Complaint and accompanying Order to Show Cause.

Dated:  New York, New York
        February 15, 2023

                        Respectfully submitted,

                        **AKERMAN LLP**


                        s/ Jeffrey A. Kimmel
                        Jeffrey A. Kimmel
                        1251 Avenue of the Americas, 37th Floor
                        New York, New York 10020
                        Email: Jeffrey A. Kimmel@akerman.com
                        Telephone: (212) 905-6408
                        *Attorneys for Plaintiff HMNY*