**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

─────────────────────────────

HARLEY MARINE NY, INC.,

                Plaintiff,

v.                                     1:23-cv-00163 (AMN/CFH)

BRIAN MOORE and CARVER MARINE STEEL
WORKS, LLC doing business as CARVER
COMPANIES,

                Defendants.

─────────────────────────────

**APPEARANCES:**                      **OF COUNSEL:**

**AKERMAN LLP**                 **JEFFREY KIMMEL, ESQ.**
1251 Avenue of the Americas, 37th Floor    **SCOTT M. KESSLER, ESQ.**
New York, NY 10020            **MOHAMMAD A. YAQOOB, ESQ.**
*Attorneys for Plaintiff*

**CAPEZZA HILL LLP**          **BENJAMIN W. HILL, ESQ.**
30 South Pearl Street, Suite P-110     **THOMAS A. CAPEZZA, ESQ.**
Albany, NY 12207
*Attorneys for Defendant Brian Moore*

**HODGSON RUSS LLP**           **GLEN P. DOHERTY, ESQ.**
677 Broadway - Suite 401           **SCOTT C. PATON, ESQ.**
Albany, NY 12207
*Attorneys for Defendant Carver Marine Steel*
*Works, LLC d/b/a Carver Companies*

**Hon. Anne M. Nardacci, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.       INTRODUCTION**

      Plaintiff Harley Marine NY, Inc. ("Harley," "HMNY," or "Plaintiff") commenced this

action on February 7, 2023, *see* Dkt. No. 1 (the "Complaint"), and filed an emergency motion by

order to show cause for a temporary restraining order and preliminary injunction eight days later,

on February 15, 2023, seeking to enjoin Defendants Brian Moore ("Moore") and Carver Marine Steel Works, LLC d/b/a Carver Companies,[1] from undertaking conduct related to Harley's alleged trade secrets and confidential information, soliciting Harley's employees and clients, and otherwise competing with Harley. *See generally* Dkt. No. 7 (the "Motion"). On February 16, 2023, the Court granted Harley's motion for a temporary restraining order in part (the "TRO"), and directed expedited briefing on the pending motion for a preliminary injunction. *See* Dkt. No. 11. After granting several requests by the parties for extensions of time, the Court held a Show Cause hearing on the Motion on March 17, 2023 (the "Motion Hearing").

For the reasons set forth herein, the Court denies Harley's Motion for a preliminary injunction and dissolves and vacates the TRO.

## II.    BACKGROUND

### A. Moore's Employment at Harley and Confidentiality Agreement

Harley hired Moore in early 2018 to work as a tugboat captain out of Harley's Bayonne, New Jersey operations. *See* Dkt. Nos. 1 at ¶ 17, 7-3 at ¶ 5, 16-2 at ¶ 3. Prior to joining Harley, Moore had over 15 years of experience in the tugboating industry. *See* Dkt. No. 16-2 at ¶ 2. By February of 2020, Moore had been promoted several times within Harley to Director of U.S. East Coast Operations. *See* Dkt. No. 7-3 at ¶¶ 5-6.

---

[1] Carver notes that Carver Marine Steel Works, LLC, although a 'Carver Company,' has no relation to this lawsuit; instead, "Defendant Brian Moore is employed by Carver Companies Payroll, LLC, [and] assigned to perform services for Coeymans Marine Towing, LLC." Dkt. No. 15 at 8 n.1 (parentheticals omitted). Carver acknowledges that the appropriate entities have "oppose[d] Plaintiff's motion for a preliminary injunction as if Plaintiff commenced suit against the proper party (or parties)," *see id*., and counsel for Carver confirmed this at the Motion Hearing. Harley has informed the Court that it will be "filing an Amended Complaint to, among other things, identify additional Carver entities as Defendants." Dkt. No. 40 at 7 n.1. As such, the use of "Carver" herein encompasses the proper, but as-of-yet unnamed, entities.

As part of his employment with Harley, Moore signed a confidentiality agreement (the "Agreement"). Dkt. No. 7-4. Moore's electronic signature on the Agreement is dated February 6, 2018. *See id*. at 4. The Agreement is chiefly concerned with protecting Harley's trade secrets and confidential information, including by limiting employee conduct with regard to such information. *See id*. at §§ 1-4. The Agreement specifies that an employee's "obligations under this Agreement with regard to any particular Confidential Information … shall continue during and after his or her employment by the Employer until such time as such Confidential Information has become public knowledge other than as a result of the Employee's breach of this Agreement or breach by those acting in concert with the Employee or on the Employee's behalf." *Id*. at § 4. Separately, the Agreement includes a non-solicitation clause, which provides that Moore "agrees [he] will not directly or indirectly solicit, induce, or otherwise persuade employees to leave [Harley] to work for or with [Moore] or a third party." *Id*. at § 12.

On or about November 17, 2022, Carver extended an offer of employment to Moore to work as a General Manager of Carver's towing subsidiary. *See* Dkt. No. 15-7 at ¶ 4. The next day, on November 18, 2022, Moore gave two-weeks' notice that he would be leaving Harley by way of an email to the executive team of the Centerline Logistics Corporation ("Centerline").[2] *See* Dkt. No. 7-5. Moore worked for Harley through about December 2, 2022, though Harley disputes the precise date.[3]

---

[2] Centerline owns and operates Harley, with apparently overlapping management personnel. *See* Dkt. Nos. 7-3 at ¶ 1, 7-7 at ¶¶ 1 & 4.

[3] In his notice email, Moore stated that his last day at Harley would be December 2, 2022. *See* Dkt. No. 7-5. Harley alleges that Moore's "last day of work at [Harley] was November 30, 2022," *see* Dkt. No. 7-9 at 5, and Harley sent Moore a "confirmation of resignation" letter, dated November 30, 2022, on or about December 1, 2022, *see* Dkt. No. 7-7 at ¶ 9 & Ex. 1. However, Moore testified that he worked remotely for Harley from Kingston, New York on December first and second. *See* Dkt. No. 16-2 at ¶ 5. This dispute does not appear to be material because Harley has made no allegations that the Defendants' illegal conduct occurred on these two days.

### B. Harley's Allegations That Moore Solicited Harley Employees

Beginning on or about the day Moore gave notice to Harley that he was leaving, Moore had conversations with several other Harley employees regarding his departure. *See* Dkt. Nos. 16-2 at ¶ 6, 20-1 at ¶ 6, 25-1 ¶¶ 2-4. The content of these discussions is disputed by the parties to this action, however, sworn testimony establishes that Moore had discussions with at least Mr. Joseph Stevenson, Mr. Leonard Baldassare, and Mr. Dylan Galm, concerning (a) Moore's departure from Harley, and (b) the fact that Moore was going to go to Carver. *See* Dkt. Nos. 16-2 at ¶ 6, 15-13 at ¶ 3, 16-4 at ¶ 3. Mr. Stevenson and Mr. Baldassare worked with Moore in Harley's Bayonne, New Jersey office, and Mr. Galm, who primarily worked remotely, also knew Moore and the others well and worked closely with them. *See* Dkt. No. 7-3 at ¶ 7. A fifth Harley employee, Mr. William Gardner,[4] was apparently present and may have participated in at least one discussion between Moore and Mr. Baldassare, in which it is undisputed that Moore discussed his departure, and the participants may have also discussed that Moore was going to Carver. *See* Dkt Nos. 20-1 at ¶ 6, 25-1 at ¶¶ 2-5. Mr. Gardner testifies that Moore further asked him to join Moore at Carver. *See* Dkt. No. 20-1 at ¶ 6. Moore denies that such solicitation occurred. *See* Dkt. No. 25-1 at ¶¶ 5 & 8.

### 1. Mr. Stevenson

On or about December 5, 2022, Moore began his employment as a General Manager with a Carver subsidiary in the towing business. *See* Dkt. Nos. 16-2 at ¶ 4, 7-3 at ¶ 14, 15-7 at ¶ 5. Around that time, Carver extended an offer of employment to Mr. Stevenson to work as a Tug Boat Deck Hand. *See* Dkt. No. 15-1 at ¶ 6. Mr. Stevenson had begun working for Harley in 2018, and while there worked closely with Moore. *See* Dkt. No. 7-9 at 11. Mr. Stevenson testifies that

---

[4] While Harley made no allegations about Mr. Gardner until its Reply, Defendants had an opportunity to address these allegations in their Surreplies and at the Motion Hearing, and thus they are properly before the Court.

in "late November" 2022 he "learned from a co-worker"[5] that Moore was leaving Harley to work at Carver. *See* Dkt. No. 15-1 at ¶ 2.  Mr. Stevenson testifies that he then "contacted a colleague at Carver (not Mr. Moore)," and "spoke to a number of Carver representatives (not including Mr. Moore)," before receiving his Carver employment offer. *See id.* at ¶¶ 4-6.  On December 14, Mr. Stevenson notified Harley that he would be resigning from his position as Deck Hand, *see* Dkt. No. 20-3 at 88, and Harley alleges that Mr. Stevenson told a Harley employee that Moore "had asked [Mr. Stevenson] to come work for [Moore] at Carver." *See* Dkt. Nos. 7-9 at 11.  Moore testifies that Mr. Stevenson "asked if Carver had any openings because [he] did not wish to continue [his] employment at Harley," *see* Dkt. No. 16-2 at ¶ 6, and Mr. Stevenson acknowledges at that time he "was already looking to leave Harley[,]" *see* Dkt. No. 15-1 at ¶ 3.  Mr. Stevenson subsequently began working for Carver on December 29, 2022. *See id.* at ¶ 7.

### 2. Mr. Galm

A month after Mr. Stevenson provided notice of his departure, on or about January 16, 2023, Mr. Galm notified Harley that he was resigning from his position as Marketing and Logistics Manager, and that his "last day will be January 31st, 2023 or at a later date if needed." Dkt. No. 7-7 at 15.  Harley alleges that in a phone call with Centerline's President, Mr. Matthew Godden, Mr. Galm said that he was leaving to go work with Moore at Carver, that Moore was Mr. Galm's "captain," meaning the two had a "close relationship," and that Mr. Galm had not been seeking out the opportunity but that it had come to him. *See* Dkt. No. 7-9 at 11-12.  Harley describes Mr. Galm's role at Harley as being the "point person for all contract negotiations and potential customer opportunities," including significant interfacing with Harley's clients, overseeing

---

[5] Mr. Stevenson does not provide any additional information about the identity of said co-worker.

millions of dollars' worth of business revenues, "check[ing] on competitive activity," and "develop[ing] new methods for capturing market shares from competitors." *See id*.

In sworn testimony, Mr. Galm acknowledges that he spoke with Moore after "hear[ing] a rumor" that Moore was leaving—ostensibly between when Moore provided his notice and when he left Harley—and they discussed aspects of Carver's business, "opportunities presented by [t]his new employer," and whether there were any opportunities for Mr. Galm there. *See* Dkt. No. 15-13 at ¶¶ 2-3, 6. Contrary to Harley's allegations, however, Mr. Galm testifies that he "was looking to leave Harley before learning that Mr. Moore was leaving," that although he made inquiries about opportunities at Carver to Moore, Moore did not answer those inquiries, and that Mr. Galm spoke with individuals at a Harley competitor and Carver concerning job opportunities before receiving and accepting an offer of employment with Carver. *See id*. at ¶¶ 3-8. Mr. Galm testifies that he received an employment offer from Carver on or about January 16, 2023, the same day he gave notice to Harley, and that he was scheduled to begin work with Carver on January 30—though he had told Harley he would stay on until January 31. *Compare id*. at ¶ 9, *with* Dkt. No. 7-7 at 15. Before Mr. Galm began employment with Carver but apparently after he had left Harley, his offer with Carver was delayed and subsequently withdrawn, which decision Carver attributed to Harley's threat of litigation. *See* Dkt. Nos. 15 at 11, 15-13 at ¶¶ 10-11. Notwithstanding that Harley has since commenced with the threatened litigation, and that Mr. Galm had possibly unsuccessfully attempted to return to Harley,[6] Carver re-offered employment to Mr. Galm, which he has accepted. *See* Dkt. Nos. 15-7 at ¶ 9, 15-13 at ¶¶ 12-15.

---

[6] Harley alleges that it "offered Mr. Galm … the opportunity to remain employed with" Harley but that Mr. Galm refused, while Mr. Galm testifies that when he sought to return to Harley, he "was left hanging" by Mr. Godden. *Compare* Dkt. 7-9 at 12-13, *with* Dkt. No. 15-13 at ¶ 12; *see also* Dkt. No. 20-3 at 90-91 (text messages exchanged between Mr. Galm and Mr. Godden).

### 3. Mr. Baldassare

On January 17, 2023, the day after Mr. Galm gave Harley notice of his resignation, Mr. Baldassare notified Centerline's executive team that he would be resigning from his position as Senior Port Captain for the Atlantic Division, and that his last day would be January 27, 2023. *See* Dkt. No. 7-6. While at Harley, Moore was Mr. Baldassare's direct supervisor, *see* Dkt. No. 1 at ¶ 28, and together "Moore and [Mr.] Baldassare were <u>the</u> decisionmakers on the day-to-day operational issues for HMNY's east coast operations." Dkt. No. 7-3 at ¶ 27 (emphasis in original). Harley alleges that Mr. Baldassare conveyed in a conversation that he was leaving Harley because "Moore had spoken to him and convinced him to join" Moore at Carver. Dkt. No. 7-9 at 12. Harley testimony also indicates that Carver acquired new office space in a shipyard in Staten Island to provide a shorter workday commute for Mr. Baldassare. *See* Dkt. No. 7-3 at ¶¶ 24-25. Mr. Baldassare acknowledges in sworn testimony that he spoke with Moore about his new job at Carver and asked Moore if he knew of any open roles for him there. *See* Dkt. No. 16-4 at ¶ 3. Mr. Baldassare testifies that he "was being overworked and underpaid at Harley" and that he had told Harley's upper management that he was interviewing for other jobs in July of 2022. *See id*. at ¶¶ 4-5. Mr. Baldassare further testifies that he did not apply for a job with Carver until January of 2023, and that he received an offer from Carver as well as from another potential employer. *See id*. at ¶¶ 6-7. When Mr. Baldassare's employment offer from Carver was delayed and then withdrawn, he secured employment with another company in the industry. *See id*. at ¶ 8.

Moore maintains that he did not solicit any Harley employees for Carver or otherwise; Carver maintains that it did not direct Moore to solicit Harley employees. *See* Dkt. Nos. 16-2 at ¶¶ 8-9, 15 at 10.

### C. Harley's Allegations That Moore Downloaded Harley Trade Secrets and Confidential Information For Use at Carver

On or about January 19, 2023, following the departure notices from Mr. Galm and Mr. Baldassare, Harley "decided to further investigate B. Moore's last activities before leaving the Company." *See* Dkt No. 7-9 at 13. Harley conducted its investigation by reviewing the account activity log generated by its internet-based file storage application, Dropbox, for activity associated with Moore's log-in credentials. *See id.* at 13; *see also* Dkt No. 20-3 at 12-86. This review revealed that Moore, or someone using Moore's log-in credentials for Harley's Dropbox account, accessed and downloaded Harley files from Dropbox on December 18 and 30, 2022, and January 5, 2023. *See* Dkt. Nos. 1 at ¶¶ 37-41, 7-9 at 13-14, 20-3 at 12-26.[7] Harley alleges that Moore was able to take these illicit actions "due to an administrative oversight"—Harley's policy that called for Moore's access to Harley's electronic accounts and programs to be terminated when his employment ended was not implemented with respect to Moore's Dropbox credentials.[8] *See* Dkt. No. 7-7 at ¶ 20. Shortly thereafter, on or about January 19, 2023, Harley terminated Moore's credentials to access Harley's Dropbox account. *See* Dkt. No. 7-8 at ¶ 13.

Consequently, Harley alleges that Moore stole trade secrets and confidential information from Harley by downloading certain files from Harley's Dropbox for the benefit of Moore's employer, Carver, in between the departures of Mr. Stevenson and Mr. Galm. *See*, *e.g.*, Dkt. No. 1

---

[7] Apparently, Harley's investigation did not reveal that Moore improperly accessed or downloaded Harley files *during* his employment, including after he gave notice of his resignation, nor has Harley made any such allegations. *See* Dkt. No. 1 at ¶¶ 49 & 61.

[8] Harley makes no allegations that Moore or Carver knew or could have known that Harley would neglect to remove Moore's access to Harley's Dropbox account upon Moore's departure from Harley. *Compare* Dkt. No. 7-7 at ¶ 20 ("due to an administrative oversight, B. Moore's Dropbox account had not been deactivated"), *with* Dkt. No. 7-8 at ¶ 6 ("When an individual's employment with [Harley] ends, the [Information Technology] Department is responsible for terminating that individual's company accounts on the last day the individual is scheduled to work.").

at ¶ 49 ("Moore undoubtedly violated … the Confidentiality Agreement by accessing and downloading various confidential files regarding [Harley]'s tugboats *weeks after the end of his employment* with HMNY.") (emphasis added).  Specifically, Harley alleges that Moore illicitly downloaded documents which included "pricing and bidding sheets with information that [Harley] accumulated over the last two decades, specifically: (i) specific and actual performance of each [Harley] vessel (i.e. how much fuel was burned, speed, distance); (ii) voyage runs and distances traveled; (iii) specific routes that can be operated safely; and (iv) expenses for consumables."  *Id.* at ¶ 61.  Harley also alleges Moore downloaded files regarding Harley's "tugboats, including (i) Stability Letters regarding each tugboat's seaworthiness; (ii) 'Blue Cards' from [Harley]'s insurance carrier in London, U.K.; (iii) Bridge Letters showing the various corporate entities who own each vessel; (iv) equipment list for each vessel; and (v) 'spec sheets' showing operating and mechanical data for each tug boat such as: fuel capacity, fluid density, flow rate, and operating pressure and temperature."  Dkt. No. 7-9 at 13; *see also* Dkt. No. 20-3 at 93-125.

Moore maintains that he "did not intentionally download any documents from Dropbox after leaving Harley."  *See* Dkt. No. 16-2 at ¶¶ 10 & 14.  He acknowledges, however, that after receiving Harley's cease-and-desist letter on or about January 20, 2023, he "realized there were several documents from his time at Harley" saved on his personal cell phone, which he promptly deleted.  *See id.* at ¶ 17.  This action was taken notwithstanding the clear litigation hold language in the cease-and-desist letter, which Moore reviewed and initialed.  *See* Dkt. No. 7-7 at 43-44.  Moore was unrepresented by counsel when he took this action.  *See* Dkt. No. 16 at 6 n.1.

### D.  The Parties and the Instant Action

Harley is a New York domestic corporation with its principal place of business located in Seattle, Washington.  *See* Dkt. No. 1 at ¶ 9.  Harley operates "primarily in the petroleum

transportation business" on the East and Gulf coasts of the United States, although it "offers its customers a wide range of services," including terminal transportation, ship assists and escort, rescue and general towing, and freight barge transportation. *See* Dkt. No. 7-7 at ¶¶ 5-6. Moore is a resident of Kingston, New York, was formerly employed by Harley, and currently works for Carver. *See* Dkt. No. 16-2 at ¶¶ 3-5. Carver comprises several businesses, including as relevant here, Carver Companies Payroll LLC, a New York domestic corporation located in Schenectady County, New York, and Coeymans' Marine Towing LLC, also a New York domestic corporation, located in Albany County, New York, which together currently employ Moore. *See* Dkt. Nos. 15 at 1 & n.1, 15-7 at ¶ 1.

On February 7, 2023, Harley filed its Complaint alleging claims for relief against Moore and Carver[9] for: (1) breach of a Confidentiality Agreement; (2) violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836 and the New Jersey Trade Secrets Act; (3) violations of the New Jersey Computer Record Offenses Act; (4) tortious interference with economic relations; (5) tortious interference with contractual relations; and (6) unfair competition. *See* Dkt. No. 1. Eight days later, on February 15, 2023, Plaintiff filed an emergency motion by order to show cause for a temporary restraining order and a preliminary injunction. *See* Dkt. No. 7. The injunction Harley requests has six components that can be generally described in terms of four categories: (1) preventing further disclosure and use of Harley trade secrets and confidential information; (2) preventing solicitation of Harley clients if known as such by Moore; (3) preventing Carver from

---

[9] Harley represents that it will further amend its Complaint, *inter alia*, "to allege New York state law claims against Carver." Dkt. No. 20 at 8 n.2. Although counsel for Harley indicated that such amended complaint would be forthcoming right after the Motion Hearing, no amended complaint has been filed. Nevertheless, the Court may resolve the Motion without considering the revised claims because (a) the Court finds that Harley fails to show likely irreparable harm, and (b) no party has raised a material conflict of the potentially applicable laws.

"engaging or associating with" Moore to compete with Harley; and (4) preventing Moore from soliciting or inducing Harley employees to work for Carver, Moore, or any other entity. *See id*. at 2-3. At the Motion Hearing, counsel for Harley informed the Court that it was maintaining its request as submitted.

Harley served the Motion and attachments thereto on counsel for Moore and Carver. *See* Dkt. No. 10. On March 8, 2023, Defendants timely filed their Oppositions to the Motion. Dkt. Nos. 15 & 16. On March 13, 2023, Harley filed a Reply in support of its Motion. Dkt. No. 20. On March 16, 2023, with the Court's permission, *see* Dkt. Nos. 21-23, Defendants each filed a Surreply opposing the Motion. Dkt. Nos. 24 & 25.[10] The Court held a Show Cause hearing on the Motion on March 17, 2023, and deferred judgment on the Motion. The Motion is thus ripe for determination.[11]

---

[10] In addition to the briefs, Harley submitted four sworn declarations with nine exhibits attached between them in support of its Motion. *See* Dkt. Nos. 7-1 to 7-8. Carver submitted five sworn affidavits with eight exhibits attached between them in support of its opposition, *see* Dkt. Nos. 15-1 to 15-13, and Moore submitted three sworn declarations with one exhibit attached to one of them in support of its opposition, *see* Dkt. Nos. 16-1 to 16-4. Harley submitted three sworn declarations with eight exhibits attached between them in support of its Reply. *See* Dkt. Nos. 20-1 to 20-3. Finally, Moore submitted one sworn declaration in support of its Surreply. *See* Dkt. No. 25-1.

[11] "An evidentiary hearing is not required" before granting or denying a motion for a preliminary injunction "when the relevant facts either are not in dispute" or when a party "waive[s] its right to an evidentiary hearing." *Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998); *accord Gazzola v. Hochul*, No. 1:22-cv-1134 (BKS/DJS), 2022 WL 17485810, at *9 n.20 (N.D.N.Y. Dec. 7, 2022). Neither party has requested an evidentiary hearing, instead choosing to rely on plethoric sworn testimony and exhibit evidence. *See, e.g.*, *Holt v. Cont'l Grp., Inc.*, 708 F.2d 87, 90 n.2 (2d Cir. 1983) ("[n]ormally a party that elects to gamble on a 'battle of affidavits' must live by that choice") (citing *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1204-05 (2d Cir. 1970) and *Dopp v. Franklin Nat'l Bank*, 461 F.2d 873, 879 (2d Cir. 1972)). Accordingly, after considering the parties' ample affidavits and exhibits, *see supra* n. 10, and oral arguments, the Court finds that material facts relevant to resolving the Motion are not in dispute and an evidentiary hearing is not necessary because, even crediting its factual assertions, Harley fails to show irreparable harm. *See, e.g.*, *Oliver v. New York State Police*, No. 1:15-cv-00444 (BKS/DJS), 2019 WL 2009182, at *1 n.1 (N.D.N.Y. May 6, 2019), *aff'd*, 812 F. App'x 61 (2d Cir. 2020).

## III.    STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Sussman v. Crawford*, 488 F.3d 136, 139-40 (2d Cir. 2007) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)) (emphasis in original). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005). Further, a preliminary injunction is "never awarded as of right," *Ayco Co., L.P. v. Frisch*, 795 F. Supp. 2d 193, 200 (N.D.N.Y. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)), and the decision to grant such relief "rests in the sound discretion of the district court[.]" *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990). In any event, preliminary "relief should be 'narrowly tailored to fit specific legal violations' and to avoid 'unnecessary burdens on lawful commercial activity.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 119 (2d Cir. 2009) (quoting *Waldman Pub. Corp. v. Landoll, Inc.,* 43 F.3d 775, 785 (2d Cir. 1994)).

A party seeking preliminary injunctive relief must establish: (a) irreparable harm; (b) either (i) a likelihood of success on the merits of the underlying claim, or (ii) both sufficiently serious questions going to the merits of the claim as to make it a fair ground for litigation and a balance of the hardships tipping decidedly toward the movant; and (c) that a preliminary injunction is in the public interest. *See N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (citation omitted). Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Bell & Howell; Mamiya Co. v. Masel Supply Co. Corp.,* 719 F.2d 42, 45 (2d Cir. 1983). There are two essential components to irreparable harm. First, "[i]t is well established that an irreparable injury is an injury that is not remote or speculative but actual and imminent[.]" *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011) (quotation

omitted).  Second, irreparable harm is an "injury for which a monetary award cannot be adequate compensation."  *Jayaraj v. Scappini,* 66 F.3d 36, 39 (2d Cir. 1995) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir. 1979)).  The movant bears the burden of proof and persuasion to show that it is entitled to a preliminary injunction because irreparable harm is likely.  *See JBR, Inc. v. Keurig Green Mountain, Inc.*, 618 F. App'x 31, 34 (2d Cir. 2015) ("the 'burden of proof and persuasion rests squarely' on the party moving for a preliminary injunction to show that irreparable harm is likely") (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)); *JSG Trading*, 917 F.2d at 79 (With respect to irreparable harm, "[l]ikelihood sets, of course, a higher standard than 'possibility.'").

One exceptional circumstance warranting injunctive relief in a trade secrets or contract action exists where the alleged breach, if unrestrained, threatens the destruction or catastrophic impairment of an ongoing business.  *See John B. Hull v. Waterbury Petro.,* 588 F.2d 24, 28-29 (2d Cir. 1978), *cert. denied,* 440 U.S. 960 (1979); *accord Adecco USA, Inc., v. Staffworks, Inc.*, No. 6:20-CV-744 (MAD/TWD), 2020 WL 7028872, at *4 (N.D.N.Y. Sept. 15, 2020) (finding irreparable harm where "there remains an indeterminate amount of damages for the loss of client relationships that would produce profits for an indeterminate amount of time").  Mere business disruptions, however, do not fall within this exception if they will be substantial but not fatal or business-altering.  *See Newport Tire & Rubber v. Tire & Battery,* 504 F. Supp. 143, 150 (E.D.N.Y. 1980) ("a moving party possesses an adequate remedy at law if the act at issue threatens only a *disruption* in an ongoing business, and not its destruction"); *accord USA Network v. Jones Intercable, Inc.*, 704 F. Supp. 488, 491-92 (S.D.N.Y. 1989).

## IV.     DISCUSSION

The parties' ample submissions and oral argument at the Motion Hearing make clear that there are significant facts in dispute that go to the merits, or likelihood of success on the merits, of the underlying claims for relief put forth in Harley's Complaint.  The Court observes, however, that none of the disputes raised by the parties or otherwise apparent from the Court's thorough examination of the record go to the first and most important question posed to this Court by the Motion: Has Harley established that absent a preliminary injunction, it will likely be irreparably harmed?  *See JBR, Inc.*, 618 F. App'x at 33 (holding that because irreparable harm "is the *sine qua non* for preliminary injunctive relief … the moving party must first demonstrate that irreparable harm would be 'likely' in the absence of a preliminary injunction before the other requirements for the issuance of a preliminary injunction will be considered") (quotations and citations omitted). The Court finds that, even fully crediting its factual assertions, Harley has not met its burden to show actual, imminent, non-monetary, or likely injury sufficient to meet the irreparable harm standard.

### A.  Irreparable Harm

Harley alleges that it will suffer irreparable harm in the form of: "(1) further divulgement of its proprietary and confidential information; (2) further loss of its valuable employees; (3) harm to its market standing and client relationships in an aggressively competitive environment; and (4) a signal to other [Harley] employees that similar conduct will not be restrained."  Dkt. Nos. 7-9 at 27-28, 20 at 25.  None of these alleged injuries—as expounded in the briefs, supporting submissions, and at the Motion Hearing—satisfies the high bar for irreparable harm.

14

**1.   Misappropriation of Harley Trade Secrets and Confidential Information**

First and foremost, Harley argues that the "loss of confidential business information"—regardless of whether such is considered a trade secret, but especially if it is—suffices to meet its burden here.  *See* Dkt. No. 7-9 at 28.  Indeed, Harley argues that "threatened use or disclosure of trade secrets is inherently irreparable and irreparable injury is presumed in such circumstances," *id*. (citing *Lumex, Inc. v. Highsmith*, 919 F. Supp. 624, 628 (E.D.N.Y. 1996), and *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, *Ltd.*, 730 F.2d 61, 63 (2d Cir. 1984)), and that Moore's "control over" Harley's information poses a "risk to HMNY's business interests because disclosure … could not be remedied after" trial.  *Id*. (citing *Jackson Hewitt, Inc. v. Barnes*, No. 10–cv–05108 (DMC)(JAD), 2011 WL 181431, at *4 (D.N.J. Jan. 18, 2011)).

However, Harley's argument is based on a misstatement of the relevant caselaw: the Second Circuit has expressly rejected various courts' reading of the *FMC Corp*. decision to mean that "a presumption of irreparable harm automatically arises upon the determination that a trade secret has been misappropriated." *Exelis, Inc. v. SRC, Inc.*, No. 5:12-CV-0858 (GTS/TWD), 2012 WL 12874469, at *9 n.7 (N.D.N.Y. Nov. 7, 2012) (quoting *Faiveley*, 559 F.3d at 118).  Indeed, as the *Exelis* court aptly observed, "at most a rebuttable presumption arises; and it does so only if 'there is a danger that, unless enjoined, the misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets.'"  *Exelis*, 2012 WL 12874469, at *9 (quoting *Faiveley*, 559 F.3d at 118-19; additional citation omitted).  As such, even a rebuttable presumption of irreparable harm is not appropriate here, where Harley has not alleged that Moore and Carver will imminently divulge Harley's information, and where sharing the allegedly misappropriated information would reduce their own alleged ability to profit from it.  *See Faiveley*, 559 F.3d at 118-19 ("[w]here a misappropriator seeks only to use [trade]

secrets—without further dissemination or irreparable impairment of value—in pursuit of profit, no [] presumption is warranted because an award of damages will often provide a complete remedy").

At the Motion Hearing, counsel for Harley acknowledged that Harley is not aware of whether Moore and Carver have used the Harley data to compete with Harley. Further, Harley could not identify any bids or customers for which it was competing with Carver or any bids or customers that it was at risk of losing as the result of illicit conduct by Moore and Carver. Rather, Harley alleges that 10% of its current revenue is derived from services that overlap with services provided by Carver, *see* Dkt. No. 20-3 at ¶¶ 34-35, although at the Motion Hearing counsel for Harley could not say whether Harley and Carver compete for any of the same customers with respect to these services. Finally, Harley argues separately that circumstantial evidence establishes that Moore and Carver were "likely" "exploring" building a fleet of "push boats" similar to Harley's to compete with Harley in the Gulf Region. *See* Dkt. No. 20 at 16.

Here, Harley has not shown that its alleged injuries are actual because Harley has not shown the extent of the damage to its business, or that such damage would be so grave as to run Harley out of business or cause it to alter its fundamental business, particularly in light of the lack of overlapping clientele. Harley nevertheless alleges that should Moore or Carver use Harley data to compete with respect to the overlapping services or regions, Harley's business may be diminished. *See* Dkt. No. 20 at 24. However, loss of such a share of a business is not an irreparable injury.[12] *See Galvin v. New York Racing Ass'n*, 70 F. Supp. 2d 163, 170 (E.D.N.Y. 1998), *aff'd sub nom.*,

---

[12] Indeed, the supplemental declaration of Centerline's CEO is emblematic of the lack of "imminent and actual" injury that pervades Harley's petition. Mr. Godden alleges that "with the information taken by B. Moore, combined with its hiring of HMNY employees, Carver could attempt to move into the oil transportation industry and unfairly compete directly with HMNY's main business line." Dkt. No. 20-3 at ¶ 33. But this remote possibility ("Carver *could attempt*…") is exactly the kind of imprecise allegation of harm that courts in this circuit do not find sufficiently "imminent and actual" to be considered irreparable harm.

166 F.3d 1200 (2d Cir. 1998) ("the loss of business need not be total, so long as it is so great as to seriously compromise the company's ability to continue in its current form."); *Jones Intercable*, 704 F. Supp. at 492 (finding plaintiff failed to show irreparable harm where "the issue in this action is not corporate 'life or death'"); *Vera, Inc. v. Tug Dakota*, 769 F. Supp. 451, 454-55 (E.D.N.Y. 1991) (declining to issue an injunction where plaintiff demonstrated injury was imminent and actual, but "d[id] not argue that the very existence of the business is threatened by" defendants' conduct, merely that the amount "is difficult to ascertain"); *see also Interboro Inst., Inc. v. Maurer*, 956 F. Supp. 188, 193-95 (N.D.N.Y. 1997) (finding no irreparable harm and declining to issue an injunction where plaintiff alleged that absent relief "it will become insolvent by the Summer term" but the court found plaintiff could take actions to avoid insolvency).

Harley has also not shown that its alleged injury is imminent because, in Harley's own words, Carver is exploring plans to build a fleet which might attempt compete with Harley in the future, a time- and resource-intensive process without guaranteed success.  *See Schwartz v. Cerner Corp.*, 804 F. App'x 85, 87 (2d Cir. 2020) (finding no irreparable harm where plaintiffs "offered no evidence that [defendant] is likely to [cause injury], however, much less that [defendant] will do so imminently" where plaintiffs could "point to no record evidence that [defendant] has even threatened to do so").  Further, it is also clear that Harley is chiefly concerned with harm to its business that could be rectified by money damages, and Harley has not shown that alleged injuries to its market standing or client relations will be non-economic beyond making conclusory assertions.  *See Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63-64 (2d Cir. 2011).  Finally, Harley has not shown that its alleged injuries are likely, particularly because although it alleges that Moore first illicitly accessed Harley's Dropbox in December, Harley has been unable to point to evidence that the injury is underway at all.  *But see Cortland Line Holdings LLC v. Lieverst*, No. 5:18-cv-

307 (TJM/DEP), 2018 WL 8278554, at *8 (N.D.N.Y. Apr. 6, 2018), *modified in part*, 2018 WL 10758581 (N.D.N.Y. June 13, 2018) (finding that the "use of [confidential] information, in addition to alleged attempts to poach customers in other ways, constitutes sufficient evidence to find irreparable harm").

Accordingly, Harley has failed to show a likelihood of "actual and imminent" injury caused by Moore's and Carver's alleged access and self-interested use of Harley's information which could not be remedied with money damages.

### 2. Solicitation of Harley Employees

Harley also argues that Moore's solicitation of Harley employees has created the "threat of immediate competition by a former employee with unique relationships with a former employer's clients also constitutes irreparable harm." Dkt. No. 7-9 at 29. In the cases Harley relies on, however, the former employers alleged violations of non-compete provisions in the restrictive covenants with their former employees. *See id*. (citing *Natsource LLC v. Paribello*, 151 F. Supp. 2d 465, 469 (S.D.N.Y. 2001) (noting the covenant that "[defendant] is restricted from working for a competitor … for three months following his termination date"); and *Euro Brokers Capital Mkts. v. Flinn*, No. 93 Civ. 3785, 1993 WL 213026, at *1 (S.D.N.Y. June 16, 1993) (observing that plaintiff "seeks to enforce the non-compete and non-disclosure clauses" in its employment contract)). Here, with respect to Harley's allegations of loss of market standing and client relationships, it appears that Harley is most concerned with Mr. Galm's departure in this respect since he was the "point person" for certain of Harley's clients. *See supra* Sec. II.B. While losing key employees can rise to the level of legally cognizable injury, *see*, *e.g.*, *Ayco*, 795 F. Supp. 2d at 206-07, Harley fails to allege that Carver and Mr. Galm (or other Harley employees) are subject to legal limitations, such as a non-compete agreement, that would limit them from engaging in an

employment relationship.[13]  *See Faiveley*, 559 F.3d at 119 ("relief should be 'narrowly tailored to fit specific legal violations' and to avoid 'unnecessary burdens on lawful commercial activity'") (citation omitted).

Moreover, in cases where injunctions are granted, plaintiffs generally show concrete injuries, for example, lost business to a competitor.  *See Euro Brokers*, 1993 WL 213026, at *1 ("According to Euro Brokers, it has already lost business to Patriot on account of Flinn's leaving Euro Brokers."); *Ayco*, 795 F. Supp. 2d at 206-07 (finding defendant's "insistence that he took no confidential records or documents [] insufficient to preclude a finding of irreparable harm" where defendant "contacted multiple clients" and caused "an existing client with a positive relationship" with the plaintiff to leave with defendant).  Here, there is no evidence that Harley has lost any business to Carver or is even competing for any business with Carver.  Indeed, Harley has not alleged any existing client overlap, despite its claims about the partial overlap in the services offered by Harley and Carver.

Simply put, none of the injunctive relief sought at this time would materially impact any injury alleged by Harley since either (a) the alleged trade secrets and confidential information have been used by an alleged competitor for the better part of two months with no indication of concrete injury, or (b) the use of such has not occurred in the intervening months, despite ample motivation as alleged by Harley, and ample opportunity given Harley's belated discovery of Moore's alleged breaches of the Agreement.  Should Harley lose business to Carver in the form of lost contract bids or clients, the court finds that it would be possible to prove money damages that would likely adequately compensate Harley.  *See*, *e.g.*, *DS Parent, Inc. v. Teich*, No.  5:13-CV-1489

---

[13] Indeed, Harley has not alleged any claims against Carver for solicitation of Harley employees independently or through Moore as Carver's agent.  *Cf.* Dkt. No. 1 at ¶¶ 65, 86, 93 (alleging improper use or disclosure of Harley's trade secrets and confidential information).

(LEK/DEP), 2014 WL 546358, at *13 (N.D.N.Y. Feb. 10, 2014) (finding that should plaintiff lose business to defendant "money damages would … be relatively easy to prove and would likely adequately compensate [plaintiff] for its loss"); *Exec. Trim Constr., Inc. v. Gross*, No. 1:20-CV-544 (MAD/DJS), 2020 WL 5232049, at *6-7 (N.D.N.Y. Sept. 2, 2020) (finding that any subsequent injury could be remedied with an award of money damages).  Accordingly, because the alleged irreparable harm Harley describes is neither imminent nor actual, and it appears any injury can be redressed following a determination of the facts, the court finds that Harley has failed to show entitlement to preliminary injunctive relief.[14]  *See JBR, Inc.*, 618 F. App'x at 36.

### B.  Remaining Elements for Injunctive Relief

Because a showing that irreparable harm is the most important prerequisite for the issuance of injunctive relief and Plaintiff has failed to make that showing, the Court need not address the remaining elements necessary to obtain such relief.[15]  *See, e.g., Edgar Agents, LLC v. Empire Filings LLC*, No. 22-CV-647 (JMF), 2022 WL 1128902, at *1-2 (S.D.N.Y. Apr. 15, 2022) (declining to issue a preliminary injunction where plaintiff failed to establish that it "lost a single customer because of Defendants' alleged wrongful conduct[,]" "the presumption of irreparable harm sometimes applied by Courts in this Circuit in trade secrets cases" did not apply because of a lack of risk of "further disclos[ure,]" and plaintiff "failed to show irreparable harm" in response to defendants' arguments); *Coscarelli v. ESquared Hosp. LLC*, 364 F. Supp. 3d 207, 221 (S.D.N.Y. 2019) ("if a party fails to show irreparable harm, a court need not even address the remaining elements" of the preliminary injunction standard) (citation omitted)).

---

[14] If the case proceeds and discovery uncovers evidence of conduct that might rise to the level of irreparable harm under the law, the Court is amenable to considering applications based on such evidence should the parties raise it.

[15] As such, the Court expresses no opinion on the merits of Harley's claims at this juncture.

## V.    CONCLUSION

Accordingly, the Court hereby

**ORDERS** that Plaintiff's Motion for a Preliminary Injunction, Dkt. No. 7, is **DENIED**; and the Court further

**ORDERS** that the temporary restraining order, Dkt. No. 11, is **DISSOLVED and VACATED**; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:  March 24, 2023
       Albany, New York

Anne M. Nardacci
U.S. District Judge